889 So.2d 743 (2004)
John Steven HUGGINS, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-2364.
Supreme Court of Florida.
December 2, 2004.
*749 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction for first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions and sentence of death.

FACTS
This is a direct appeal from John Steven Huggins' second trial for the murder of Carla Larson on June 10, 1997. Huggins was indicted on May 28, 1998, in Orange County. Venue was later transferred to Duval County, where, on February 3, 1999, Huggins was convicted of first-degree murder, carjacking, kidnapping, and robbery. The jury recommended a sentence of death, and the trial court imposed the jury's recommendation. However, within weeks of the conclusion of the case, defense counsel learned of information that the State knew but never disclosed. On March 25, 1999, Huggins filed a petition for a writ of habeas corpus in the trial court, alleging that the State had withheld Brady[1] material. In light of the pending petition, this Court relinquished jurisdiction over Huggins' first direct appeal. After an evidentiary hearing, the trial court granted Huggins a new trial, finding that the State had violated the dictates of Brady.[2] The State appealed that ruling, and *750 this Court affirmed, finding that the suppressed evidence was material and failure to disclose it resulted in a verdict not worthy of confidence. See State v. Huggins, 788 So.2d 238, 244 (Fla.2001).
Upon this Court's remand, the trial court granted a change of venue to Osceola County, and in April 2002, an unsuccessful attempt was made to select a jury in Osceola County. Pursuant to a joint stipulation, venue was then transferred to Hillsborough County. Jury selection began in Hillsborough County on July 15, 2002, and a six-day trial followed. On July 25, 2002, the jury found Huggins guilty of murder in the first degree, carjacking, kidnapping, and petit theft as a lesser included offense under the robbery charge.
The facts of the case as presented at Huggins' second trial were as follows. The victim, Carla Larson, was married and had a daughter. She was an engineer for Centex-Rooney, a construction company, and was working on Disney's Coronado Springs project in June 1997. She drove a white Ford Explorer with a black bug guard on the front, light blue pinstripes, a Passport radar detector hard-wired to the dash, and air conditioning and radio controls in the back seat. On the morning of June 10, 1997, Larson took her daughter to day care and went to work. Just prior to lunch, Larson told a co-worker, Cindy Garris, that she was going to a grocery store to pick up food for an afternoon meeting. Garris suggested that she go to a new Publix grocery store on International Drive, just off of the Osceola Parkway, and Larson indicated that she would go there. Larson left work at approximately noon. A Publix receipt indicated that she purchased food at 12:11 p.m. However, Larson never returned to work.
Numerous witnesses testified to various sightings that afternoon of a white sport utility vehicle (SUV) on a dirt road off of the Osceola Parkway that led into a wooded area. Between 12:30 and 12:45 p.m., Barry O'Hearn and his landscaping crew were eating lunch in that wooded area when O'Hearn saw a white Ford Explorer drive past him on a dirt road. He could only describe the driver as white. Between 12:45 and 1 p.m., Floyd Sparks, Disney's superintendent of drainage and roadways in the area, was driving on the Osceola Parkway and saw, through a fire break line in the woods, that an SUV was parked *751 in an unauthorized area of the woods. Though normally part of his job, Sparks was not able to investigate it at that time. Gary and Brad Wilson, a father and son who both worked for Centex-Rooney, were returning from lunch on the Osceola Parkway just prior to 1 p.m. when they saw a white Ford Explorer exit from the dirt road onto the Osceola Parkway at an unusually high rate of speed. Their vehicle soon passed the Ford Explorer, and both looked at the driver. Brad Wilson later told a sketch artist that the driver was a white male with a dark tan, weathering of the face, highlights in his hair, and a moustache and beard. He testified at trial that the driver had longer, brownish hair and described his facial hair as a close growth. Gary Wilson, however, described the driver as a white male who was flushed in the face, had medium-length dark hair, and no facial hair. Finally, between 2:30 and 3 p.m., Chris Smithson, a subcontractor on the Coronado Springs project, saw a white Ford Explorer exit from the dirt road, partially cross the Osceola Parkway, stop in the median and wait to merge with on-coming traffic. Smithson noticed the vehicle because it was nice and seemed out of place in the woods. Smithson later saw Huggins in the median and identified him as the driver of that vehicle.
Two days after Larson's disappearance, two of her co-workers instituted a search. They encountered Sparks, who mentioned the SUV he had seen two days earlier. Sparks then went to the point on Osceola Parkway from where he had seen the SUV and, via hand-held radios, directed Larson's co-workers to the point where he could see them through the same fire break line. From there, they were led by smell to a body about 200 feet away. The body, which was naked and covered by a towel, was later identified as Larson. Dr. Shashi Gore, the medical examiner in this case, testified at trial that significant decomposition indicated the body had been there for approximately two days and concluded from his autopsy that death was by strangulation. Except for her wedding band, the jewelry Larson usually wore was missing, as was her clothing and purse. Months later, on December 24, 1997, a landscaping crew found Larson's purse in the brush off of the driver's side of a ramp along World Drive between the Osceola Parkway and Highway 192.
On the day of Larson's disappearance, Huggins and his wife, Angel, were visiting Orlando with their five children. Although Huggins and Angel were estranged, the family stayed together at a Days Inn on Highway 192 near the Osceola Parkway and International Drive on the evenings of June 8 and 9, 1997. At the trial, Huggins' sixteen-year-old son, Jonathon Huggins, testified that he could not remember much about the trip, which had occurred five years earlier. The trial court found that Jonathon was effectively unavailable as a witness, and his prior deposition was admitted. In Jonathon's deposition, he stated that in the summer of 1997, his father did not have a car and the family visited Orlando in Angel's small car. On the day after visiting Gatorland, they returned to Angel's house without his father, and his father later returned in a different vehicle, which Jonathon remembered as being dark in color, new in appearance, with air vents and radio controls in the back seat, and a clean interior. Jonathon also remembered riding in that vehicle approximately three times and that later that summer, his father drove him back to Panasoffkee, where Jonathon lived with his grandmother, in a little blue car.
Angel Huggins' mother, Fay Blades, with whom Angel lived in Melbourne, testified that on June 10, 1997, she returned home from work a little after 5 p.m. and found an unfamiliar, white SUV in her *752 carport. She saw Jonathon Huggins in the house but left shortly thereafter to attend night school. One of Blades' neighbors testified that she saw a white Ford Explorer at Blades' home on two consecutive days sometime around June 11, 1997. And a second neighbor testified that he once saw in Blades' driveway a white SUV and a similar vehicle that had been poorly spray-painted a dark grey or black color later the same week.
Kevin Smith, a friend of Huggins who worked in lawn maintenance and lived near Cocoa Beach, testified that on June 12, 1997, Huggins arrived at Smith's house in a white SUV that appeared new. It contained a radar detector hard-wired to the dash and may have had a "car bra" on the front and blue pinstripes. Huggins asked if he could park the vehicle at Smith's house. Two days later, Huggins returned, spoke with Smith for a while, and took the vehicle. Smith testified that sometime later, he found an unfamiliar radar detector in a box on top of his exterior water heater, realized its significance after being interviewed by police, initially threw it in a vacant lot, and ultimately showed the police where to find it. A police witness testified that it was a Passport radar detector.
Another witness, Charlotte Green, testified that sometime after she heard of Larson's murder, a white Ford Explorer that was partially spray-painted black cut in front of her at a high rate of speed in the Melbourne area. Two days later, she saw the same vehicle stopped along a fishing river in Cocoa Beach with all of its doors open and a man standing at the back hatch. Green further testified that she saw the burned remains of a vehicle in the same location the following day. After seeing Huggins on a television report, Green identified him as the driver.
At 11:23 p.m. on June 26, 1997, the police received a call that a truck was burning on a vacant lot in Cocoa Beach. An investigation revealed that the truck was the victim's Ford Explorer. The arson investigator testified to the presence of a fire accelerant and white paint partially covered with black paint. Over-spray on the tires indicated the black paint had not been professionally applied.
In late June and July, 1997, police conducted three searches of Blades' house and a shed on her property, but no incriminating evidence was found.[3] However, Blades testified that her curiosity led her to conduct her own search. As part of that search, she unscrewed the cover of an electrical box within her shed and discovered jewelry wrapped in some paper. Blades turned the jewelry over to police, and Larson's husband later identified it as Larson's missing jewelry.
In his defense, Huggins presented the testimony of a number of witnesses at trial. That evidence indicated that the burned vehicle was removed from Cocoa Beach prior to the time Green testified that she had seen it; that no call to the Sheriff's Office from Smithson was logged into police records of complaint or 911 calls in June 1997; that Smith had long hair, a dark tan, and facial hair in June 1997; that Smith owned an old van painted with black primer paint; and that no hair or DNA samples from the crime scene were matched to Huggins. In closing arguments, defense counsel accused Smith of *753 being the killer, noting that Smith resembled the sketch of the man Brad Wilson described, lived near where the burned vehicle was found, had possession of the radar detector, and was the only person placing Huggins at Smith's house. Defense counsel suggested that Smith painted the vehicle to match the van he already owned and gave Larson's jewelry to Angel Huggins when she visited him on June 15.[4] Defense counsel also heavily stressed the circumstantial nature of the State's case.
Huggins elected to represent himself in the penalty phase. The trial court allowed him to discharge his counsel after first conducting a Faretta[5] hearing. On July 26, 2002, the jury heard penalty-phase testimony. The State presented documentary evidence relating to Huggins' nine prior violent felony convictions and probation, together with three victim-impact witnesses  the victim's husband, mother, and best friend  who each read previously prepared statements about Larson and their relationships with her. Huggins presented only one witness, his sister, Sandra Huggins, who testified to some family background. On the same day, the jury recommended a sentence of death by a nine-to-three vote. Special verdict forms were utilized and indicated that all twelve jurors made the following specific findings beyond a reasonable doubt: (1) the crime was committed while Huggins had been previously convicted of a felony and was on felony probation; (2) Huggins has been previously convicted of another capital offense or of a felony involving the use or threat of violence to some person; (3) the crime was committed while Huggins was engaged in the commission of the crime of kidnapping; (4) the crime was committed for financial gain; and (5) the crime was especially heinous, atrocious, or cruel. All twelve jurors also specifically rejected "any aspect of the defendant's character, record, or background" or "other circumstance of the offense" as mitigating factors.
On August 26, 2002, the trial court held a Spencer[6] hearing, at which Huggins read a statement regarding his life background and the State introduced a letter from the victim's mother. The trial court ordered a presentence investigation report, which contained numerous comments from family and friends emphasizing Huggins' missionary and church work. The trial court also took into consideration the mitigation evidence presented in the penalty phase of Huggins' first trial. On September 19, 2002, the trial court issued its order sentencing Huggins to death for the first-degree murder conviction. The trial court found the five aggravating circumstances previously found by the jury and thirteen nonstatutory mitigating factors, which were given slight to some weight. The trial court also imposed a sentence of sixty days for petit theft and departure sentences of thirty years for carjacking and life imprisonment for kidnapping.

ANALYSIS
Huggins raises eleven points on appeal. In the first, he asserts that the trial court erred in admitting (1) certain evidence to prove consciousness of guilt, and (2) for *754 impeachment purposes, the fact that Huggins had nine prior felony convictions.
On May 5, 1998, at a hearing attended by Huggins, the circuit court issued an order granting the State's motion to compel the collection of hair samples from Huggins. At trial, over defense objection, the State called a crime scene investigator who testified that pursuant to that court order, he attempted to collect hair samples from Huggins on May 12, 1998, but was unable to collect pubic hair because Huggins' pubic region was completely shaved. The State then introduced a photograph taken that day of the upper portion of Huggins' pubic region. On cross-examination, defense counsel elicited testimony that the correctional facility in which Huggins was housed at the time was old and not air-conditioned. Later, Huggins presented the testimony of a correctional officer who worked at the jail in which Huggins was housed in May 1998. The officer testified that that facility was not air-conditioned and quite hot in the summer, that outbreaks of crab lice would occur, and that one method of addressing the problem would be for an inmate to shave. One specific portion of the officer's direct testimony was as follows:
Q During the period of July of 1997, when Mr. Huggins was incarcerated, under part of your supervision, were you ever notified that Mr. Huggins complained of crabs?
[STATE'S ATTORNEY]: Objection. Hearsay.
THE COURT: Sustained.
Q Did Mr. Huggins ever directly contact you and indicate that he had crabs?
A You mean directly? I don't recall that he did or did not.
....
Q To your knowledge, did Mr. Huggins ever shave his pubic region after complaining of lice?
[STATE'S ATTORNEY]: Objection. Hearsay. Basis of knowledge.
THE COURT: Overruled. You can answer the question, if you have personal knowledge. Not what someone else told you.
A Yes, I did.
Q Okay. And do you know whether he did, in fact, shave himself?
A Yes, he did.
On cross-examination, the State's attorney asked the officer how he knew that Huggins had shaved because of crab lice. The officer responded, "That's what he said." The State's attorney then asked, "So your answer to counsel's question was based upon what Mr. Huggins told you?," and the officer responded, "Pretty much."
At the close of the defense's case-in-chief, the State requested judicial notice of Huggins' nine prior felony convictions and an instruction to the jury that they could consider the fact of those convictions in assessing the credibility of Huggins' statement, as related by the correctional officer, that he had shaved due to crab lice. The defense objected, arguing that any statement was elicited on the State's cross-examination and that introduction of the convictions would be prejudicial. The court reviewed the trial transcript and found the convictions admissible under section 90.806, Florida Statutes (2002). The court then informed the jury of the fact of Huggins' nine prior felony convictions, without specifying the nature of the crimes involved, and gave a limiting instruction regarding the jury's use of that information.
Huggins first argues that the trial court erred in admitting evidence regarding his shaved pubic region because that evidence *755 was susceptible to an explanation other than consciousness of guilt. He relies on the decisions in Herring v. State, 501 So.2d 19 (Fla. 3d DCA 1986), State v. Esperti, 220 So.2d 416 (Fla. 2d DCA 1969), and Menna v. State, 846 So.2d 502 (Fla.2003), to argue that this incident was so ambiguous as to remove from its invocation any probative value. However, we find those decisions, which involved voluntary gunshot residue testing, inapplicable to the present case, which involves a court-ordered collection of a hair sample.
Because the parties cite to and we have found no case law in Florida addressing a factual scenario on point with the instant case, we must look to the general principles governing consciousness-of-guilt evidence. This Court has stated:
The law is well settled that "[w]hen a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." Straight v. State, 397 So.2d 903, 908 (Fla.1981). However, we have held that in order to admit this evidence, there must be a nexus between the flight, concealment, or resistance to lawful arrest and the crime for which the defendant is being tried in that specific case. See Escobar v. State, 699 So.2d 988 (Fla.1997). Moreover, such an interpretation should be made with a sensitivity to the facts of the particular case. See Bundy v. State, 471 So.2d 9 (Fla.1985) (citing United States v. Borders, 693 F.2d 1318, 1325 (11th Cir.1982)).
Looney v. State, 803 So.2d 656, 666-67 (Fla.2001) (quoting Randolph v. State, 463 So.2d 186, 189 (Fla.1984)). This Court has stated in a number of cases that in order for the State to sufficiently demonstrate relevance and materiality, there must be a sufficient nexus between evidence of flight or concealment and the crime for which the defendant is being tried. See, e.g., Murray v. State, 838 So.2d 1073 (Fla.2002); Escobar, 699 So.2d at 995. Here, the evidence indicated that Huggins was present at the court hearing at which the hair collection was ordered. Additionally, the facts show that Huggins shaved his entire pubic region within one week of the date of that court order. We conclude that those facts provide a sufficient nexus upon which the trial court could base its exercise of discretion in admitting this evidence. Furthermore, we note that Huggins' explanation regarding jail conditions and crab lice went to the weight of the evidence, rather than its admissibility.
Huggins also contests the admission of his nine prior felony convictions for impeachment purposes, arguing that the State, rather than defense counsel, elicited the hearsay statement attributed to Huggins and that evidence of Huggins' nine felony convictions should have been excluded under the balancing test of section 90.403, Florida Statutes (2002). The trial court admitted the fact of Huggins' convictions on the basis of section 90.806(1), Florida Statutes (2002), which provides in part that "[w]hen a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness." The trial court's ruling was made in accordance with First and Fourth District Court of Appeal holdings that section 90.806 permits the introduction of a defendant's felony convictions when the defendant elicits his or her own exculpatory, hearsay statement through another *756 witness at trial. See Kelly v. State, 857 So.2d 949 (Fla. 4th DCA 2003); Werley v. State, 814 So.2d 1159 (Fla. 1st DCA 2002); Llanos v. State, 770 So.2d 725 (Fla. 4th DCA 2000). Two of those decisions cite the following treatise passage concerning the functionally identical federal evidence provision: "A defendant who chooses not to testify but who succeeds in getting his or her own exculpatory statements into evidence runs the risk of having those statements impeached by felony convictions." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 806.04(2)(b) (Joseph M. McLaughlin ed., 2d ed.2002). We agree with the First and Fourth Districts on that point of law. Under section 90.806(1), a hearsay declarant is treated as a "witness" and his or her credibility may be attacked in the same manner as any other witness's credibility. In turn, section 90.610(1), Florida Statutes (2002), provides in pertinent part that "[a] party may attack the credibility of any witness ... by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year."[7]
Additionally, we find that the testimony quoted above supports the trial court's conclusion that defense counsel initially elicited testimony from the correctional officer attributing a hearsay statement to Huggins. Indeed, defense counsel specifically asked the officer, "Did Mr. Huggins ever directly contact you and indicate that he had crabs?" When the State's hearsay objection was sustained, defense counsel indirectly elicited the same information by including it as an implied assumption within the question "To your knowledge, did Mr. Huggins ever shave his pubic region after complaining of lice?" The State's later question, "So your answer to counsel's question was based upon what Mr. Huggins told you?," was designed merely to reveal the implication that defense counsel had already succeeded in getting before the jury. Thus, pursuant to section 90.806, as properly construed in Llanos, Werley, and Kelly, Huggins opened the door to his own impeachment.
Regarding Huggins' argument that evidence of his nine prior felony convictions should have been excluded under the balancing test of section 90.403, this Court must determine if the trial court abused its discretion. See Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). Section 90.403 provides that relevant evidence is inadmissible if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." The general principle behind section 90.610, Florida Statutes (2002), which permits the use of convictions for impeachment purposes under certain circumstances, supports the conclusion that the fact of Huggins' prior felony convictions had probative value regarding the credibility of the hearsay statement attributed to him. The trial court attempted to limit any danger of unfair prejudice by refraining from informing the jury of the *757 nature of Huggins' crimes and by giving a limiting instruction regarding the jury's use of the information. On the basis of these facts, we conclude the trial court did not abuse its discretion in admitting this evidence for impeachment purposes.
In Huggins' second point of appeal, he asserts that the trial court erred in admitting testimony regarding the victim's plans on the day of her murder. At trial, the State presented the testimony of Cindy Garris, who was the office manager for Centex-Rooney in June 1997. Over a defense objection, Garris testified that on June 10, 1997, she and Larson had a conversation prior to lunch in which Larson indicated she was going to a Goodings grocery store to pick up food for a meeting, Garris suggested a new and closer Publix grocery store, and Larson indicated that she would go there and return shortly. Huggins argues that this testimony was inadmissible hearsay. We find the testimony fell squarely within the hearsay exception in section 90.803(3), Florida Statutes (2002), which provides that a statement of the declarant's then-existing state of mind, including a statement of intent, is not inadmissible when offered to prove or explain acts of subsequent conduct of the declarant so long as the statement was not made under circumstances that indicate its lack of trustworthiness. First, the State introduced Larson's statement of intent to prove her subsequent conduct of going to Publix. Second, there is no indication from the record that Larson's statement was made under circumstances that indicate its lack of trustworthiness. Third, although case law provides that a victim's state of mind is inadmissible unless probative of a material issue, see Brooks v. State, 787 So.2d 765, 771 (Fla.2001), this case falls within an exception to that rule because the State also introduced the statement to inferentially rebut the defense argument that Larson may have voluntarily accompanied her killer from Publix to another location. See id. (noting exception where state of mind of victim-declarant is used to rebut a defense raised by defendant). Therefore, we conclude the trial court did not abuse its discretion in admitting this testimony.[8] Moreover, even if the trial court erred, we would find such error harmless beyond a reasonable doubt because the Publix receipt also established Larson's subsequent conduct.
In Huggins' third point of appeal, he asserts the trial court erred in granting the State's challenge for cause to a prospective juror without following the dictates of State v. Neil, 457 So.2d 481 (Fla.1984). During individual voir dire, the following inquiry of prospective juror Coley occurred:
THE COURT: This trial will take approximately two weeks. Will that impose an unreasonable burden on you to sit and hear this case for the next two weeks?
JUROR COLEY: No.
....
THE COURT: State may inquire.
....
[STATE'S ATTORNEY]: I notice from your jury questionnaire you work at McDonald's?

*758 JUROR COLEY: Yes.
[STATE'S ATTORNEY]: What do you do there?
JUROR COLEY: I'm a maintenance man.
[STATE'S ATTORNEY]: Okay. Have you made arrangements with your employer to pay you while you're in jury service?
JUROR COLEY: Well, I told him about it, but I ain't make arrangements about it.
[STATE'S ATTORNEY]: Okay. I want to make sure that if you are here for two weeks, is it going to cause you any financial problems as far as paying your bills, things like that?
JUROR COLEY: For two weeks?
[STATE'S ATTORNEY]: Yeah, I don't know if you work at night, normally, or during the day, but obviously, if you are here, you probably won't be able to work. I want to make sure that won't cause you a financial problem or a hardship.
JUROR COLEY: Well, see, I don't know how much they pay for jury duty.
[STATE'S ATTORNEY]: I don't know what the habit is in Hillsborough County, but generally they don't pay very much. Certainly not a reimbursement for lost wages. Some people can handle that; some people can't.
JUROR COLEY: Oh, I can't.
[STATE'S ATTORNEY]: Okay. That's what the judge asked about. Whether it would be burdensome. That's kind of what he was getting at. We don't want you to not be able to pay your light bill because you are on jury duty. Do you think that that is going to be any problem for you?
JUROR COLEY: It would be a little bit of a problem, to tell you the truth.
[STATE'S ATTORNEY]: Okay. That's why I brought it up. I want to make sure you thought that through.
JUROR COLEY: Okay.
[STATE'S ATTORNEY]: At this point, if your employer does not pay you while you are on jury duty, will you be able to afford to not work for two weeks, not get paid for two weeks to be on jury duty?
JUROR COLEY: No.
At this point, defense counsel objected "to the back door [Neil] objection in this phase," and arguments were heard at the bench.
At the bench, defense counsel noted that the State questioned Coley about financial problems despite the fact that Coley's prior answer to the court's question had indicated no inconvenience. Defense counsel then noted that Coley was a black male. In response, the prosecutor stated that it was unclear whether defense counsel was asking the court to order a race-neutral reason for the questioning. The court stated it would ask Coley to inquire of his employer whether he would be paid. In response, defense counsel "move[d] the court to assure that all prospective jurors are paid the same rate that they would pay at their normal jobs." The court noted its own lack of authority to order juror reimbursement beyond what is set by state statute, and the prosecutor argued that the motion was untimely because it challenged the constitutionality of the statute on jury compensation.
Open court resumed, and Coley was requested to contact his employer. The court informed Coley of the statutory juror compensation and that he would need to determine whether that would be sufficient to cover his personal obligations. Upon Coley's later return, he informed the court that his employer would pay him five dollars a day, and the court inquired further:

*759 THE COURT: Okay. Since we know that you would only get five dollars a day from your employer for serving on jury duty, next question, sir, is if you are selected to serve on this jury, will it cause you any financial problems to the extent that it would hurt you financially?
JUROR COLEY: Yes.
THE COURT: And would you tell me how it would hurt you financially if you were asked to serve for the next two weeks?
....
JUROR COLEY: Okay. Like you said, I got to pay my rent, I got to pay my lights, stuff, and I got stuff that I got to pay for, my TV that I got, all that. I ain't going to be able to pay for everything. So 
THE COURT: So not to put words in your mouth, you would be able for some, but some of the things you would lose?
JUROR COLEY: Yes, I would.
The State then moved to excuse juror Coley for cause based on financial circumstances. In response, defense counsel argued that to eliminate jurors who are day workers or whose employers do not make up the difference between their regular wages and statutory juror compensation would deprive Huggins of a fair cross-section of the community. In response, the State argued that defense counsel should have filed a pretrial motion. In rebuttal, defense counsel urged that the issue is not null until it presents itself and that the court "has the right to do thing[s] to ensure protection." The court then ruled as follows:
The issue of jury compensation, and the limits on jury compensation is something that has been well known to all lawyers that practice in the field of criminal law and civil law. It has been quite well known that certain jurors, when asked to serve, particularly for extended periods of time, would either cause them financial hardships or personal hardships. While we look at the fact that jury service is something that all citizens should do, we also recognize that we should not cause a juror, because of their service, to suffer a financial hardship. The young man in question, who is African American, indicated even though he would like to serve, that it would cause him a number of hardships.... I agree with [the State's attorney], when these things are known pre-trial, they should be brought up. The Supreme Court in the case of Correll versus State amply points that out when dealing with new, significant evidence where it is known ahead of time, has been presented before, if one waits until it's being offered, the Correll case stands for the proposition that that should have been brought up pre-trial. The motion, or the objection to excusing Mr. Coley for cause will be denied. Be excused for cause, based upon financial hardship.
Defense counsel made no additional objections, and Coley was excused.
In this appeal, Huggins asserts that the trial court erred in granting the State's challenge for cause to Coley. However, based upon the above recitation of facts, we do not agree with Huggins' assertion in his initial brief that "[d]efense counsel objected, contending that the state was unfairly excluding a black juror without being forced to follow the dictates of State v. Neil, 457 So.2d 481 (Fla.1984)." Initial Brief of Appellant at 45. With the exception of defense counsel's single, initial statement that he "object[ed] to the back door [Neil] objection in this phase," the primary focus of defense counsel's arguments and objection when the State moved for cause was on the exclusion of nonsalaried day workers who might encounter *760 financial difficulties due to jury service in a two-week trial  not the exclusion of African-American jurors. While at one point defense counsel indirectly implied that the State's questioning of Coley might be based on race, defense counsel never asked the trial court to conduct a Neil inquiry, even after the prosecutor specifically noted that it was unclear whether "[defense counsel] is asking the court to order me to make some race neutral reason why I ask it." As this Court has stated, "A party objecting to the other side's use of a peremptory challenge on racial grounds must: (a) make a timely objection on that basis, (b) show that the venire person is a member of a distinct racial group, and (c) request that the court ask the striking party its reason for the strike." Melbourne v. State, 679 So.2d 759, 764 (Fla.1996) (emphasis added) (footnotes omitted). We therefore conclude that Huggins failed to meet this requirement for raising and preserving the issue now argued before this Court. But even if properly preserved, we find this claim to have no merit.
In Huggins' fourth point on appeal, he argues that the trial court erred in excluding "reverse Williams[9] rule evidence" tending to prove that another person committed the murder. Pretrial, Huggins filed a notice of intent to use similar fact evidence, alleging the following:
Calvin Duane Rewis killed William Glenn Lewis, Sr., sometime between 6-9-97 and 6-26-97 in Duval County, Florida. Rewis killed Lewis and stole his late model Ford Explorer. Lewis' body was found hidden in a thick tree line off a highway. His body was wrapped around the head and feet. Rewis and Lewis were known to travel and work construction in and around central Florida. Rewis was in Orlando on June 10, 1997.
Rewis was convicted of first degree murder and robbery in the death of Mr. Lewis. In addition, Mr. Rewis' criminal history includes robbery, dealing in stolen property, and auto theft. See attached documents.
Three documents were attached to the notice. The first was a printout of Rewis's criminal history, which reflected numerous prior charges for burglary, grand larceny, and vehicle theft, together with the homicide, vehicle theft, and robbery charges relating to the Lewis murder. The second attachment was the homicide report for the Lewis murder, which indicated that Lewis was murdered between June 11 and 26, 1997, in his Jacksonville home; that Rewis was living with the victim at the time; that the victim died from blunt trauma by a hammer; that the body, which was wrapped in plastic and a bedspread, was found ten feet into a tree line off a Georgia highway; that various witness statements indicated Rewis stole the victim's vehicle and several property items, a few of which he later tried to sell; and that although Rewis stated in interviews that he knew of several locations where the police could find the bodies of victims murdered by a man named "Dray" and "dumped on top of the ground," no such bodies were located after several attempts to do so. The third attachment was the investigative tip sheet that identified Rewis as a potential suspect in the Larson murder. It indicated that John Ricker, a Centex-Rooney employee, called the police on July 11, 1997, and provided the name and phone number of Jim Benson. Ricker stated that Benson had information about a white male who was arrested for murder, was known to travel from Cocoa Beach to Miami and Tampa, was in Orlando on June 10, 1997, and had a Centex-Rooney money *761 clip in his possession when arrested. The tip sheet further indicated that a detective contacted Benson, who stated that his father, Calvin Rewis, "has been known for theft of automobiles" and was awaiting transport to Duval County on a murder charge.
After receiving Huggins' notice of intent, the State made an oral motion requesting that the court require Huggins to proffer the evidence he wished to present at trial. The court agreed and ordered the defense to proffer the Rewis evidence.[10] Thereafter, the State also filed a written motion opposing the evidence and arguing that the attachments to Huggins' notice demonstrated numerous dissimilarities between the Lewis and Larson murders, as well as the fact that Rewis was in jail on the date Larson's vehicle was burned. In a pretrial hearing addressing the State's motion, defense counsel argued that the Rewis evidence was admissible as similar fact evidence of "pattern of criminality, motive, [and] opportunity," and the State responded that none of those issues were established by the proffered evidence. Defense counsel also offered to disclose ex parte additional facts, which the trial court rejected. The court granted the State's motion and excluded Huggins' proffered evidence, stating:
When you compare the two murders, the victim in the Rewis case, the victim was a man. In this particular case, the victim is a woman. In that case, the defendant and the victim in the Rewis case had a prior relationship. That is, they knew each other. In this case, the Larson case, there is no evidence whatsoever that the defendant or the victim knew each other. In the Rewis case, the victim was found clothed, and wrapped. In the Larson case, the victim was found nude. In the Rewis case, the victim died as a result of blunt force trauma. In this particular case, the victim died as a result of strangulation, asphyxiation. In the Rewis case, the victim was killed in his home. In this particular case, the evidence is that Ms. Larson was kidnapped and killed outside of her home. Either in a wooded area, or inside of her car. Thus, this evidence is not unique, nor are there similar factors. Nor is there any evidence pointing to the similarity of these two crimes....
Huggins now appeals that decision.
A trial court's exclusion of evidence of similar crimes committed by another person for exculpatory purposes, generally referred to as "reverse Williams rule evidence," is subject to an abuse of discretion review. See Kimbrough v. State, 700 So.2d 634 (Fla.1997). This Court first considered reverse Williams rule evidence in Rivera v. State, 561 So.2d 536, 539 (Fla.1990), where it stated:
[W]here evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission. § 90.404(2)(a), Fla. Stat. (1985). However, the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.
Thus, in Rivera, this Court compared the proffered crime to the subject crime and ultimately determined that their dissimilarities *762 were "sufficient to preclude its admissibility as relevant evidence." Id. at 540. In so ruling, this Court acknowledged some similarities between the crimes but specifically noted the dissimilarity in age and body type of the victims, that one body was found clothed and the other nude, that one body was weighted down in a canal and the other was in a vacant field, that there was evidence of anal sex in one case and not the other, and that the victims were abducted in different counties. Six months after Rivera was issued, this Court expanded on the principles guiding reverse Williams rule evidence in State v. Savino, 567 So.2d 892, 894 (Fla.1990), stating:
The test for admissibility of similar-fact evidence is relevancy. Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or "fingerprint" type of information, for the evidence to be relevant. Drake v. State, 400 So.2d 1217 (Fla.1981); State v. Maisto, 427 So.2d 1120 (Fla. 3d DCA 1983); Sias v. State, 416 So.2d 1213 (Fla. 3d DCA), review denied, 424 So.2d 763 (Fla.1982). If a defendant's purpose is to shift suspicion from himself to another person, evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense. Evidence of bad character or propensity to commit a crime by another would not be admitted; such evidence should benefit a criminal defendant no more than it should benefit the state. Relevance and weighing the probative value of the evidence against the possible prejudicial effect are the determinative factors governing the admissibility of similar-fact evidence of other crimes when offered by the state. These same factors should apply when the defendant offers such evidence.
This Court also rejected the argument that the standard of similarity should be less strict when similar-fact evidence is offered by the defendant. Id.
Later, in Crump v. State, 622 So.2d 963 (Fla.1993), this Court affirmed a trial court's exclusion of defense questions to a detective witness regarding whether he had been given information that another suspect had committed similar crimes. Relying upon the principle stated in Savino that evidence of past criminal conduct of another person should be of such a nature that it would be admissible if that person were on trial for the present offense, this Court concluded that evidence concerning the detective's interviews was inadmissible hearsay that would not have been admissible had the other suspect been on trial for the crime with which Crump was charged. And, in Gore v. State, 784 So.2d 418, 432 (Fla.2001), this Court found that a trial court did not abuse its discretion in excluding reverse Williams rule evidence because the defendant "did not proffer the underlying facts of the [similar fact crime] to the trial court to enable the court to determine whether [it] was relevant and sufficiently similar to [the subject crime] to warrant admissibility."
In the present case, Huggins asserts a theory of relevancy based largely on facts that were never proffered to the trial court. Even after being ordered by the court to do so, Huggins failed to file a written proffer or orally present further information to the court regarding the Rewis evidence until after the close of the evidentiary portion of trial. In his briefs to this Court, Huggins asserts that Rewis *763 was a violent felon with a penchant for stealing cars who was in Orlando on the day Larson disappeared, failed to show up for work after her disappearance, had a Centex-Rooney money clip in his possession when arrested in late June 1997, and admitted responsibility for several homicides after which he dumped the victims' bodies on the ground unburied. Although some of these facts regarding Rewis are supported by the attachments to Huggins' notice of intent to present similar fact evidence, many of his specific points of relevancy were never argued before the trial court. Thus, as in Gore, the trial court cannot be said to have abused its discretion where Huggins did not proffer the underlying facts of the Rewis crimes to it in order to enable it to determine whether the purported similar fact crime was relevant and sufficiently similar to warrant admissibility.
Additionally, many of the facts relied upon by Huggins would not have been admissible had Rewis been on trial for Larson's murder. First, Rewis's criminal record, indicating his "penchant for stealing cars," would not have been admissible without a showing of similarity between his prior vehicle thefts and the carjacking in this case. Huggins failed to allege, let alone prove, such similarity. Second, Huggins' claim that Rewis had admitted responsibility for several homicides was not supported by the documents submitted to the court, which indicated that Rewis had stated that he knew of murders committed by another man and that those bodies were not found. Third, the only source for the "facts" that Rewis was in Orlando on June 10, 1997, and that he had a Centex-Rooney money clip when he was arrested was the phone call from Ricker to the police that was recorded on the tip sheet. However, the tip sheet itself would be inadmissible hearsay, similar to the information derived through the detective's interviews in Crump. Although Huggins could have called Ricker to testify, he failed to discover and inform the trial court of the source of Ricker's information. Given that the tip sheet listed Ricker as a Centex-Rooney employee rather than a police officer and that Ricker identified Benson as the person with information, it is reasonable to infer that his knowledge of Rewis was not direct but was based on hearsay.
Finally, the trial court is correct in its conclusion that the Lewis and Larson murders were quite dissimilar. Lewis was a 42-year-old white male who was killed by blunt force from a hammer in his own home and whose body was disposed of off the side of a road, clothed and wrapped in plastic and a bedspread. Additionally, Rewis lived with Lewis and stated in various confessions that his murder was the result of events arising out of Rewis's financial debt to another man for drugs. Larson, on the other hand, was a young woman who was killed by strangulation after being kidnapped in a public place and whose naked body was disposed of in the woods. Huggins presented no evidence to the trial court that Rewis knew Larson. Further, many of the facts contained in the Lewis murder report are contradictory to a theory that Rewis murdered Larson. Rewis's employer told the police that Rewis stated on June 9, 1997, that he wanted to visit his son in Jessup, Georgia  a fact suggesting Rewis was not in Orlando on June 10. Others told the police that they saw Rewis driving Lewis's vehicle around the same time Larson's vehicle was missing  a fact suggesting Rewis was not in possession of the Larson vehicle. Further, the report indicates that Rewis was arrested in Hillsborough County on June 24, 1997, two days prior to the date Larson's vehicle was set on fire on the other side of the state. Therefore, we conclude that the trial court *764 did not abuse its discretion in excluding the Rewis evidence.
In Huggins' fifth point of appeal, he argues that the trial court erred in admitting allegedly prejudicial evidence. Huggins first challenges the introduction during the medical examiner's testimony of photographic slides of the crime scene and the victim's body, which he argues lacked relevance and were gruesome to the point that any possible relevance was outweighed by unfair prejudice. This Court has stated that "[t]he test for admissibility of photographic evidence is relevancy rather than necessity," Pope v. State, 679 So.2d 710, 713 (Fla.1996), and has upheld the admission of photographs where relevant to "explain a medical examiner's testimony, to show the manner of death, the location of wounds and the identity of the victim.'" Larkins v. State, 655 So.2d 95, 98 (Fla.1995). While Huggins is correct that the photographs in this case depicted significant decomposition of the body, that decomposition was relevant to the medical examiner's conclusion that the body had been exposed to the elements for two or three days, a fact indicating that Larson was murdered on the day of her disappearance. Additionally, various photographs were utilized to show possible traumatic injury to the victim's left hand, thighs, and genital region, as well as to demonstrate the basis for his conclusion that the victim died from strangulation. Thus, we conclude that the trial court did not abuse its discretion in admitting these photographs as part of the medical examiner's testimony regarding the manner and timing of death and the location of possible antemortem injury.
Huggins next challenges the introduction of the medical examiner's testimony regarding the effects of strangulation on a victim. Pretrial, Huggins filed a motion in limine to prohibit the medical examiner from testifying regarding the psychological effects of strangulation. In response, the State argued that testimony regarding the physiological effects of fear fell within the medical examiner's area of expertise. The trial court denied the motion but instructed that the testimony be limited to language such as "fear" or "fright" and not "terror" or "horror." At trial, the medical examiner described how a conscious victim who is being strangled will experience a "frightening fear" causing him or her to struggle and that suffocation might occur after one or two minutes unless struggling results in only intermittent pressure. The following testimony was also given:
Q Now, how does death actually come in this process? I mean, you said about the struggling, the oxygen. What does it feel like, physically?
A Well, it's, of course, intense pain, initially, on the neck.
[DEFENSE COUNSEL]: Object to the characterization, your honor. Not necessary for the jury to determination of the fact at issue.
THE COURT: Overruled.
....
A Well, it's, of course, terrible pain on the neck area, when somebody is being  putting pressure on the neck, so there is a sense of impending death, fright, and different systems of the body, they start working. For example, heart will start beating more. It is adrenalin type of reaction, when adrenaline is pumped into your system. Pulse rate. Sweating starts, and the heart starts pumping fast.
Q Is there any pain associated with not being able to breathe? In other words, do the lungs hurt, anything like that that goes with that?

*765 A Well, there is not pain into the lungs. But the pain primarily is only in the neck area. And psychological pain is there always. Suffering. That, you know, that the death is coming there.
Huggins appeals the admission of this testimony. However, this Court has long recognized that a "trial court has broad discretion in determining the range of subjects on which an expert witness may be allowed to testify, and, unless there is a clear showing of error, its decision will not be disturbed on appeal." Johnson v. State, 393 So.2d 1069, 1072 (Fla.1980). Given that the medical examiner's testimony was primarily directed toward the description of the physiological rather than psychological effects of strangulation and remained within the confines of the trial court's limits as to language, we conclude that the trial court did not abuse its discretion in permitting this testimony.
Huggins next challenges the admission, over defense objection, of the victim's purse and its contents, testimony revealing the victim was a wife and mother, and victim-impact evidence. We find the trial court did not abuse its discretion with regard to this evidence. The purse and its contents were relevant to establishing the victim's ownership of those items, which were discovered at a different location than the body. Although the introduction of many of the individual items within the purse was unnecessary to establishing ownership, the particular items that Huggins claims would engender sympathy for the victim were introduced as parts of composite exhibits without specific testimonial reference to them or publication during trial. The testimony that indirectly revealed that the victim was a wife and mother was brief and directly relevant to showing what activities the victim engaged in on the day of her murder and what items were within the victim's stolen vehicle. Finally, the victim-impact evidence presented during the penalty phase of the trial encompassed three statements  by the victim's husband, mother, and best friend  regarding their relationship with the victim and the loss they suffered due to her murder. This Court has previously approved the use of victim-impact evidence in penalty-phase proceedings, see Windom v. State, 656 So.2d 432 (Fla.1995), and the record in this case reveals that the evidence introduced by the State fell within the purpose of section 921.141(7), Florida Statutes (2002), which allows the jury to consider "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death."
In Huggins' sixth point of appeal, he argues that the trial court erred in denying his motion for judgment of acquittal. The standards applicable to this issue are as follows:
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. "A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Orme v. State, 677 So.2d 258, 262 (Fla.1996).
"The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury *766 verdict, we will not reverse." Darling v. State, 808 So.2d 145, 155 (Fla.) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)), cert. denied, 537 U.S. 848, 123 S.Ct. 190, 154 L.Ed.2d 78 (2002). In meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Darling, 808 So.2d at 156 (quoting Law, 559 So.2d at 189).
Johnston v. State, 863 So.2d 271, 283 (Fla.2003) (some citations omitted), cert. denied, ___ U.S. ___, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004). Thus, we must determine if there is competent, substantial evidence that supports Huggins' convictions and is inconsistent with his theory of events.
We find the following competent, substantial evidence presented at trial supports the carjacking, kidnapping, petit theft, and murder convictions. Larson left work at noon on June 10, 1997, with the intention of buying food at Publix and returning shortly. She in fact bought food at Publix but did not return to work. Her body was found two days later, and it was determined that she had been strangled to death. Larson had been driving a white Ford Explorer with a black bug-guard in the front, light blue pinstripes, a Passport radar detector, and air-conditioning and radio controls in the backseat. On the day of her disappearance, between 12:30 and 12:45 p.m., a white Ford Explorer was seen on the dirt road leading to the wooded area where Larson's body was later found. Between 12:45 and 1 p.m., a white SUV was seen parked about 200 feet from where Larson's body was later found. Just prior to 1 p.m., a white Ford Explorer was seen exiting the wooded area on a dirt road and driven by a white male. Also, between 2:30 and 3 p.m., a white Ford Explorer exiting the wooded area on the dirt road was again seen by a witness who identified Huggins as the driver. Huggins was in the specific area of Orlando on the day of Larson's murder but did not leave the area in the same car in which he arrived. Huggins' mother-in-law saw an unfamiliar white SUV at her home on the evening of June 10, 1997. Huggins parked a white SUV at a friend's house in Cocoa Beach on June 12 and 13. That friend described the vehicle as having a "car bra" on the front, blue pinstripes, and a radar detector. He later found a Passport radar detector on his property. Neighbors of Huggins' mother-in-law saw a white SUV parked at her house at around this same time period and later saw that it had been poorly spray-painted a dark color. Another witness twice saw a white, partially spray-painted Ford Explorer in the Melbourne and Cocoa Beach areas and identified Huggins as the driver. Finally, Huggins' mother-in-law found the victim's jewelry hidden in an electrical box within her shed, to which Huggins had access.
We also conclude that evidence presented at trial was inconsistent with the defendant's theory of events. The primary issue in dispute at trial was identity. Defense counsel argued to the jury that the State's case was circumstantial in nature and did not preclude the possibility that Kevin Smith was the killer or that the victim voluntarily accompanied her killer from Publix. However, testimony identifying Huggins as the driver of a white Ford Explorer which exited the wooded area where Larson's body was found, placing an unfamiliar white SUV at Huggins' mother-in-law's house, and identifying Huggins as the driver of a partially spray-painted SUV in the area where Larson's spray-painted vehicle was later burned contradicts the Smith-as-killer theory. *767 Furthermore, testimony indicating Larson expected to return to work shortly after going to Publix, together with the reasonable inference that Larson, a wife and mother, would not have voluntarily accompanied Huggins from Publix to a wooded area, contradicts the hypothesis that Huggins was not kidnapped prior to her murder.
In Huggins' seventh point of appeal, he argues that the trial court erred in denying his request for a jury instruction regarding circumstantial evidence. However, we have consistently found that since this Court deleted the instruction on circumstantial evidence from the standard jury instructions, it is within the trial court's discretion to not give such an instruction. See, e.g., Floyd v. State, 850 So.2d 383, 400 (Fla.2002) ("We have previously stated that when proper instructions on reasonable doubt and burden of proof are given, an instruction on circumstantial evidence is `unnecessary.'"); Darling v. State, 808 So.2d 145 (Fla.2002); Monlyn v. State, 705 So.2d 1, 5 (Fla.1997). We likewise conclude that the trial court did not abuse its discretion in refusing to give the requested instruction on circumstantial evidence in Huggins' case.
In Huggins' eighth point of appeal, he argues that the trial court erred in denying his four written motions to disqualify Assistant State Attorney Jeff Ashton. In the first motion, Huggins generally alleged that Ashton's continued representation of the State upon retrial gave "rise to the appearance of impropriety." At the hearing on this motion, defense counsel noted Ashton's prior failure to disclose evidence that resulted in the retrial,[11] the State's appeal to this Court of the trial court's order for retrial, and Huggins' personal complaint to The Florida Bar against Ashton. On the basis of this Court's case law, the trial court found Huggins had demonstrated no "specific prejudice" and denied the motion. In the second motion, Huggins alleged that Ashton's loss of a letter from a potential witness, which apparently constituted impeachment evidence pertaining to Angel Huggins, had caused actual prejudice to the defense. At the hearing on this motion, the State conceded that the letter had been lost but noted that Huggins could depose the potential witness and that the State was attempting to retrieve a copy of the letter. The trial court expressed concerns about the issue but denied the motion. In the third motion, Huggins alleged that Ashton had failed to provide full and complete disclosure of tip sheets. Throughout the pretrial period, defense counsel repeatedly raised this issue in hearings, with the State arguing that full disclosure had already been provided and defense counsel arguing that pages were missing and some tip sheets suggested the existence of other information not yet provided. In response to this discovery litigation, the trial court ordered the State to file with the court copies of all discovery provided. Thus, having taken measures to resolve the discovery litigation, the trial court again denied the third motion. A fourth motion was filed on the day of the Spencer hearing,[12] and the court again denied the motion.
In this appeal, Huggins' primary argument is that upon re-trial, which resulted from Ashton's failure to disclose Brady material during the first trial, Ashton had a personal stake in the successful prosecution of Huggins in order to validate his initial successful prosecution. Huggins appears to assert that the prejudice resulting from this was the increased strength of the *768 State's case in his second trial. The State, on the other hand, argues that Huggins failed to establish the required specific prejudice, as best evidenced by the absence of any appellate claims based upon the specific conduct complained of below.
Regarding motions for the disqualification of a state attorney, this Court has stated:
[D]isqualification is proper only if specific prejudice can be demonstrated. State v. Clausell, 474 So.2d 1189, 1190 (Fla.1985). Actual prejudice is "something more than the mere appearance of impropriety." Meggs v. McClure, 538 So.2d 518, 519 (Fla. 1st DCA 1989). Disqualification of a state attorney is appropriate "only to prevent the accused from suffering prejudice that he otherwise would not bear." Id. at 519-20.
Farina v. State, 680 So.2d 392, 395-96 (Fla.1996); see also Kearse v. State, 770 So.2d 1119 (Fla.2000). Therefore, this Court has previously determined similar issues on the basis of whether the defendant suffered actual prejudice from the complained-of conduct. See Rogers v. State, 783 So.2d 980, 992 (Fla.2001) (acknowledging that prosecutor's conduct of instructing investigators to search defendant's jail cell without warrant and seize documents was clearly improper but holding defendant not specifically prejudiced because neither prosecution nor police involved in case examined seized documents, all documents were returned, and State did not use seized documents at trial); Kearse, 770 So.2d at 1129 (affirming denial of motion where prosecutor was judge-elect but "blanket assumption that such a person would have an advantage in court" could not be made); Farina, 680 So.2d at 395-96 (finding no actual prejudice where prosecutor asked court clerk to assign case to another division where particular judge was only sitting judge, especially as that judge ultimately did not preside over case); Bogle v. State, 655 So.2d 1103, 1106 (Fla.1995) (rejecting claim where formal hearing established that no prejudicial information had been exchanged between defendant's former counsel who was hired by state attorney's office and assistant state attorney handling defendant's case).[13]
Huggins' first basis of support for his motion was that Ashton's failure to disclose the Brady material at the first trial justified his disqualification upon retrial. However, he has failed to allege facts indicating that disqualification would have prevented "prejudice that [Huggins] otherwise would not bear." The failure to disclose the Brady material was remedied by the trial court's order of a new trial, and Ashton's disqualification would not have provided any further remedy. Huggins also argues that Ashton had a personal stake in the prosecution because retrial resulted from his own conduct. However, to conclude that disqualification was necessary based on this general allegation would effectively require disqualification of the prosecutor every time a criminal case is retried, despite the fact that this Court has always required a showing of actual prejudice, *769 which is "something more than the mere appearance of impropriety."
Huggins' second basis of support for his motion was that the State's case became stronger in the years between his first and second trials. Again, Huggins fails to establish specific prejudice. First, Huggins has consistently failed to allege within any degree of specificity how the State's case was strengthened. Second, assuming arguendo that the State's case did strengthen, there is no indication that Ashton's disqualification would have remedied that. If Ashton had been disqualified, another prosecutor simply would have replaced him. Third, the length of time between the first and second trials primarily resulted from the intervening appeal by the State of the trial court's order granting retrial, which was permissible action, not prosecutorial misconduct.
Huggins' third and fourth bases of support for his motion were allegations that Ashton lost potential impeachment evidence pertaining to Angel Huggins and failed to fully comply with discovery requests. The loss of the impeachment evidence was harmless because the evidence was relevant to the impeachment of Angel Huggins, who did not testify at Huggins' second trial. The alleged failure of compliance with discovery requests is insufficient to establish specific prejudice. First, Huggins fails to specifically identify the items that were allegedly missing from discovery production. Second, in the absence of record evidence of a failure to comply with discovery requests, such as a finding by the trial court that the State committed discovery violations, this Court cannot conclude that disqualification was the necessary remedy.
Finally, Huggins argues that Ashton should have been disqualified because Huggins had filed a grievance against him with The Florida Bar. However, the filing of a grievance in and of itself does not provide a basis for the removal of a prosecutor.
In Huggins' ninth point of appeal, he argues that the trial court erred in finding the aggravating circumstances that the murder was committed during the course of a kidnapping, was committed for pecuniary gain, and was especially heinous, atrocious, or cruel. When the finding of an aggravating circumstance is challenged on appeal, the standard of review is whether competent, substantial evidence supports the trial court's finding. Willacy v. State, 696 So.2d 693, 695 (Fla.1997).
In finding that the murder was committed during the course of a kidnapping, the trial court noted the following:
It was uncharacteristic for Carla Larson not to return to work or to return home at the end of a work day. She had an excellent relationship with her husband and child. There was absolutely no reason for Carla Larson not to return to work or home. Additionally, there was absolutely no reason for her to go to the wooded area where her body was eventually found. The only credible reason for her failure to return to work or home and to be in the wooded area where her body was subsequently located, was that she had been kidnapped by the defendant. The record in this case clearly supports that Carla Larson was taken by force or threat of force, against her will, and taken to the place where she was murdered and robbed.
State v. Huggins, No. CR98-7190 at 5 (Fla. 9th Cir. Ct. order filed Sept. 19, 2002) (sentencing order). We find no error in the reasoning of the trial court and affirm the trial court's determination.
*770 In finding that the murder was committed for pecuniary gain, the trial court noted that the evidence showed that Huggins was in possession of the victim's Ford Explorer on June 10 through 26, 1997, and that the victim's missing jewelry was found in a shed at Huggins' mother-in-law's home, to which Huggins had access. The trial court further noted:
The evidence showed that the body was found in a wooded area some two miles away from where the defendant and his family were staying during their visit to the Orlando area. If the taking of this vehicle was merely an afterthought, then it would seem logical that the defendant would have simply abandoned the vehicle after facilitating his escape from the scene of the murder and returning to his family where ready transportation was awaiting him. But the defendant did not abandon the vehicle. Instead, he kept the Explorer and used it until it was no longer feasible to openly drive it. The defendant's actions clearly indicate that he intended to benefit by taking the Explorer and its subsequent use by him.
Further, the evidence established that when she left home that morning, Carla Larson was wearing a diamond ring, diamond earrings and a necklace.... These items were not simply discarded some distance from the body like the victim's purse.
Why were these items not discarded like the purse? The answer is simple  they were taken because of their financial worth.
Sentencing order at 6-7. Although Huggins asserts that the evidence fails to establish that he was motivated by a desire to financially benefit from the victim's vehicle and jewelry, the evidence established that Huggins did not own a car during the relevant time period and utilized the victim's vehicle for over two weeks after her murder. Furthermore, Huggins and Larson were strangers to each other, and nothing in the evidence suggests Huggins was motivated to commit the crime for another reason. Finally, the jury unanimously convicted Huggins of carjacking and petit theft. Thus, we conclude that competent, substantial evidence supports the trial court's finding that Larson's murder "was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995).
In finding the murder was especially heinous, atrocious, or cruel, the trial court noted that Larson was kidnapped and driven more than two miles to a dirt road that led to a wooded area, that she was strangled to death, and that there was no evidence she was unconscious when strangled. "[I]t is permissible to infer that strangulation, when perpetrated upon a conscious victim, involves foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable." Tompkins v. State, 502 So.2d 415, 421 (Fla.1986). This Court has consistently upheld this aggravating factor where a conscious victim was strangled. See, e.g., Conde v. State, 860 So.2d 930 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1885, 158 L.Ed.2d 475 (2004); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997). In this case, the medical examiner testified that Larson died of asphyxiation due to severe neck trauma and strangulation. Additionally, the autopsy indicated possible antemortem trauma to her left hand, thighs, and genital region, but did not reveal any head injury. Thus, the medical examiner's testimony supports the reasonable inference that Larson was conscious at the time she was strangled, and we find competent, substantial evidence supports the finding of the heinous, atrocious, or cruel factor.
*771 In Huggins' tenth point on appeal, he asserts that the death penalty is not warranted in this case. In accordance with the jury's findings, the trial court found the following aggravating factors: (1) the crime was committed while Huggins had been previously convicted of a felony and was on felony probation; (2) Huggins has been previously convicted of another capital offense or of a felony involving the use or threat of violence to some person; (3) the crime was committed while Huggins was engaged in the commission of the crime of kidnapping; (4) Huggins committed the crime for financial gain; and (5) the crime was especially heinous, atrocious, or cruel. The trial court found the following nonstatutory mitigating factors: (1) Huggins abused alcohol, had broken marriages, and was a good Samaritan  given some weight; (2) he had a positive attitude toward people of other races  given some weight; (3) Huggins could contribute spiritual support to the prison community if given a sentence of life without parole  given very little weight; (4) Huggins suffered continuous violence at the hands of his father  given very little weight; (5) Huggins witnessed violence by his father toward his mother  given little weight; (6) Huggins endured difficult family separation as a child  given slight weight; (7) he is a caring and loving parent  given some weight; (8) Huggins actively participated in religious functions  some weight; (9) he contributed his inheritance and more to the church  given some weight; (10) Huggins was active in the "Love a Child" ministry in Florida  given some weight; (11) Huggins served the sick and the poor, and ministered to the children in Haiti  given some weight; (12) he served the homeless through his contribution and labor  given some weight; and (13) he demonstrated good conduct during trial proceedings  given very little weight.
In deciding whether death is a proportionate penalty, this Court considers the totality of the circumstances of the case and compares it to other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). However, this proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Here, the majority of Huggins' arguments asserting that the death sentence is not proportionate in his case are of the type of "lingering doubt" arguments not properly considered in a proportionality review.[14] His other arguments highlight the facts of his life on which the trial court based the numerous mitigating factors. Additionally, he argues that two of the aggravating factors are relatively weak because many of his prior convictions arose from a single incident, and his probation resulted from charges of possession of an unauthorized driver's license and issuing a worthless check. In response, the State notes that Huggins has nine prior violent felony convictions and had been on felony probation less than a year when Larson was murdered.
Given Huggins' numerous prior violent felony convictions, the nature of this crime, which supports the heinous, atrocious, or cruel factor, and the existence of three other aggravating factors, this case presents substantial aggravation. Additionally, although the trial court found numerous mitigating factors, none were statutory or given great weight and most *772 primarily involved the single circumstance that Huggins had participated in a great deal of missionary and church work. On the basis of this record, we conclude that Huggins' sentence of death is proportionate to other cases where the death sentence has been applied. See, e.g., Stewart v. State, 872 So.2d 226 (Fla.2003) (finding proportionality where victim forced to drive to woods where defendant robbed and killed him, and court found three aggravating factors, including prior violent felony conviction and that capital felony was committed for pecuniary gain, and mitigation in form of two statutory mitigating factors and twenty-three nonstatutory mitigating factors); Conde v. State, 860 So.2d 930 (Fla.2003) (finding proportionality where female victim was stranger to defendant and strangled to death, and court found three aggravating factors, including heinous, atrocious, or cruel and prior violent felony conviction, one statutory mitigating factor, and five nonstatutory mitigating factors, including positive influence on family despite adversity and status as model inmate).
In Huggins' final point of appeal, he argues that Florida's death penalty sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and that the trial court's use of special verdict forms in the penalty phase was inconsistent with the requirements of section 921.141, Florida Statutes (2002), and violated his constitutional rights. With regard to the former, we deny this claim, as we have denied similar claims. See, e.g., Globe v. State, 877 So.2d 663 (Fla.2004); Smith v. State, 866 So.2d 51 (Fla.2004); Johnston v. State, 863 So.2d 271 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Jones v. State, 845 So.2d 55 (Fla.2003); Chavez v. State, 832 So.2d 730, 767 (Fla.2002). In particular, we note that one of the aggravating factors found in this case is based on Huggins' prior violent felony convictions.
Pretrial, Huggins filed various motions based on Ring, one of which requested specific jury findings of penalty-phase facts. The trial court denied that motion, but later utilized, in addition to the normal verdict form for the penalty phase, special verdict forms on which the jury was to indicate the aggravating and mitigating factors found and the number of jurors finding those factors. Prior to penalty-phase jury instructions, Huggins objected to the use of the special verdict forms and argued that the forms had the effect of changing the statutory scheme of Florida's death penalty sentencing. In this appeal, Huggins claims that the use of the forms violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and under article 1, sections 9 and 17 of the Florida Constitution. However, Huggins fails to allege any prejudice from the use of the forms. Therefore, without determining whether the use of these special verdict forms constituted error, we find that any error was harmless under State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

CONCLUSION
For the reasons stated above, we affirm the convictions and sentence of death.
It is so ordered.
WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, J., concurs in result only.
PARIENTE, C.J., dissents with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, C.J., dissenting.
I would reverse the convictions in this case because of the erroneous admission of *773 evidence that Huggins shaved his pubic region, ostensibly to show consciousness of guilt. The trial court compounded the error when it allowed the introduction of Huggins' nine prior felony convictions to impeach his hearsay explanation of why he shaved his pubic region. Although I would reverse the convictions and death sentence because of these trial errors, I nevertheless commend the trial court for presenting the jury with special interrogatories on the aggravating and mitigating circumstances during the penalty phase.

Evidence of Shaved Pubic Region
One week after the trial court ordered Huggins to submit samples of his head hair and pubic hair for comparison with other evidence, a crime scene investigator sent to collect the samples discovered that Huggins' pubic region was recently shaved, precluding collection of a pubic hair sample at that time. The investigator was able to obtain a sample of Huggins' scalp hair. The State sought to admit both the investigator's testimony and a photograph of the shaved area to support its assertion that Huggins was attempting to avoid the court-ordered testing because it would yield incriminating evidence. Huggins argued that the evidence was irrelevant and misleading because there was an innocent explanation why he shaved his pubic region: to combat a crab lice infestation at the detention facility where he was being held.
The appropriate inquiry for admission of an attempt to conceal evidence of a crime is whether a clear nexus exists between the act of concealment and the offense for which the defendant is on trial. See Menna v. State, 846 So.2d 502, 506 (Fla.2003). If the act is "so ambiguous as to remove from its invocation any probative value ... as to the issue of the defendant's alleged consciousness of guilt," the evidence is inadmissible. Id. at 506-07. This test applies to the court-ordered submission of pubic hair samples in this case. Ambiguity of purpose can arise in a variety of circumstances, and is not limited to refusal to participate in a voluntary procedure, as in Menna. Regardless of whether the procedure allegedly evaded or hampered by the defendant is voluntary or compulsory, the defendant's act must clearly appear to be an attempt to avoid the gathering of inculpatory evidence before the jury may be exposed to what would otherwise be an irrelevant and prejudicial matter.
In Looney v. State, 803 So.2d 656, 667 (Fla.2001), this Court stated that the determination of whether there is a sufficient nexus to demonstrate materiality "should be made with a sensitivity to the facts of the particular case." Several factors present in this case deprive this evidence of the proper nexus between the act of Huggins' shaving his pubic region and consciousness of guilt. First, as advanced by Huggins, the heat and humidity in the unairconditioned facility where Huggins was housed created favorable conditions for lice infestations that led some inmates to shave their pubic hair to combat the problem.[15] Second, Huggins shaved only his pubic region, not his head, from which samples were also ordered to be taken. Third, shaving is at best a temporary measure. In contrast to destruction of an object to prevent the discovery of inculpatory evidence, the inevitable regrowth of hair would have enabled the State to obtain a pubic hair sample a relatively short time later. Under these circumstances, Huggins' act evinced a desire to avoid a lice infestation as much as, or more than, it *774 showed a desire to avoid submitting pubic hair for analysis. I conclude that pursuant to Menna and Looney, this evidence was erroneously admitted as evidence of consciousness of guilt.

Evidence of Nine Prior Felony Convictions
The error in exposing the jury to this equivocal evidence was further compounded by allowing the introduction into evidence of Huggins' nine prior felony convictions after Huggins' counsel attempted to elicit testimony from a correctional officer that Huggins shaved his pubic region to avoid being infested with lice. First, it is not even clear from the testimony that the correctional officer's knowledge of Huggins' explanation for shaving came solely from what Huggins told him, which would be necessary for impeachment of Huggins as a hearsay declarant under section 90.806(1), Florida Statutes (2004). Second, assuming the explanation came solely from Huggins, this hearsay statement was ultimately elicited on cross-examination by the State and not (because of the State's hearsay objections) by Huggins, as required for impeachment of a hearsay declarant under the precedent relied upon by the majority. See majority op. at 756-57. Third, the issue of why Huggins shaved his pubic region was a collateral matter at best. Impeachment on a collateral matter is not proper. See Caruso v. State, 645 So.2d 389, 394 (Fla.1994) (reiterating well-established rule that "if a witness is cross-examined concerning a collateral or irrelevant matter, the cross-examiner must `take' the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point").
The wholly collateral character of the matter on which Huggins was impeached by the prior convictions distinguishes this case from the precedent cited by the majority for prior-record impeachment of a defendant's exculpatory hearsay statement. See majority op. at 756. In two of the decisions relied upon by the majority, the defense elicited hearsay statements indicating the defendant's innocence of the crime charged. See Kelly v. State, 857 So.2d 949, 950 (Fla. 4th DCA 2003) (holding defendant's felony record admissible to impeach credibility of defendant's statements elicited by defense to show that in its entirety, interrogation in which statements were made was exculpatory on crime charged); Werley v. State, 814 So.2d 1159, 1160 (Fla. 1st DCA 2002) (holding defendant's felony record admissible to impeach credibility of defendant's statements to his wife introduced in attempt to show that he injured her accidentally). The third case cited by the majority for admission of a prior record to impeach a defendant's exculpatory hearsay statement, Llanos v. State, 770 So.2d 725 (Fla. 4th DCA 2000), concerned the defendant's probationary status rather than his prior record. In Llanos, the State was permitted to introduce evidence that the defendant was on probation at the time of a domestic battery to show that he wanted the victim to remain silent about the crime so he could avoid having his probation revoked, rather than because he was remorseful and wanted to resume the relationship, as stated in hearsay introduced by the defense. See id. at 726. In each of these cases, the hearsay directly concerned the alleged criminal conduct, and thus impeachment was not on a collateral matter. Here, however, the prior-record impeachment on a collateral matter took the jury far from the question of the defendant's guilt of the charged murder.
Even when the impeachment does not go to a collateral matter, the impeachment evidence may be excluded under section 90.403, Florida Statutes (2004), which provides *775 that evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. See id. Indeed, the potential for unfair prejudice and confusion of issues would appear to be greater when the impeachment is accomplished solely through a credibility attack, as with prior convictions, rather than through contradictory evidence or inconsistent statements by the witness on a specific matter. Cf. Riechmann v. State, 581 So.2d 133, 140 (Fla.1991) (observing that "the nature and remoteness of prior convictions" may justify exclusion under section 90.403).
In this case, the prior record created the danger, posed by all collateral-crime evidence, "that [the] jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged." Robertson v. State, 829 So.2d 901, 913-14 (Fla.2002). In this case it is likely that the jury would focus on Huggins' nine prior convictions as evidence of guilt rather than as a reason to disbelieve the innocent explanation for Huggins' act of shaving his pubic region.
Weighed against the potential prejudice, the probative value of Huggins' prior felony record was slight. The prior record was relevant only on the narrow issue of the credibility of Huggins' statement as to why he shaved his pubic region. The State did not attempt to introduce the prior record under section 90.404, Florida Statutes (2004), which governs the admission of evidence of other crimes, demonstrating its irrelevance for any purpose but impeachment. Accordingly, the prior record should have been excluded under section 90.403.
Even assuming that the testimony concerning Huggins' reason for shaving his pubic region opened the door for impeachment and that the prior record was not inadmissible under section 90.403, I nonetheless question whether the admission of Huggins' prior record is authorized by section 90.806. Section 90.806(1) provides that the credibility of a hearsay declarant "may be attacked ... by any evidence that would be admissible for those purposes if the declarant had testified as a witness." A nontestifying hearsay declarant has not been given the opportunity to admit or deny the prior conviction, a prerequisite to introduction of the record of the conviction against a witness under section 90.610, Florida Statutes (2004). See, e.g., Gavins v. State, 587 So.2d 487, 489-90 (Fla. 1st DCA 1991). See generally McArthur v. Cook, 99 So.2d 565, 567 (Fla.1957) ("[T]he proper procedural approach is simply to ask the witness the straight-forward question as to whether he had ever been convicted of a crime."); § 90.610, Fla. Stat. Ann. (1999) (Law Revision Council Note  1976) ("McArthur ... sets forth the accepted procedure for using prior convictions to impeach.") Further, the rationale for prior-record impeachment is that the willingness to violate the law bears upon the witness's willingness to disregard the oath to tell the truth. See Charles W. Ehrhardt, Florida Evidence § 610.1, at 519 (2003 ed.). This rationale does not apply when the "testimony" being impeached is a hearsay statement not made under oath.
Section 90.610(1) further provides that a "party may attack the credibility of any witness, including an accused," with the witness's prior criminal record. (Emphasis supplied.) However, section 90.806(1), which governs impeachment of hearsay declarants rather than witnesses, authorizes admission of "[e]vidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement." A prior criminal record that *776 is unrelated to the hearsay statement is not "inconsistent" with the statement.

Harmless Error Analysis
The focus on Huggins' shaved pubic region and nine prior convictions cannot be considered harmless error beyond a reasonable doubt. Although substantial circumstantial evidence pointed to Huggins, absolutely no physical evidence directly linked him to the murder. Further, the prosecutor emphasized the evidence of Huggins' shaved pubic region and his prior convictions in closing argument:
And lastly of all, you have the pubic hair issue.... The defendant was in court with his attorney and the court ordered him to submit to pubic hair samples.... And what happens when the law enforcement officer goes there to get the samples? He has shaved every bit of pubic hair off of his body, which their own expert acknowledges makes analysis impossible. Makes it absolutely impossible. Basically, what we have shown is the defendant made any hair analysis by the state absolutely impossible.
Now, how has the defense responded to that? They have responded... that he shaved his pubic hair off because of an infestation of lice. You have to decide the credibility of the defendant as he made that statement. You got to decide whether that statement is believable or not. And one of the things the court will instruct you, you may consider, among a lot of others, is the defendant's felony convictions. You have to decide whether a statement made by a nine-time convicted felon is worthy of your belief.... It's not. That ... is an excuse. That, in fact, the reason that he shaved off his pubic hair was for exactly the reason that I discussed ... designed to make it impossible to find evidence to convict him, and that's exactly what John Huggins did when he shaved off his pubic hair.

(Emphasis supplied.)
Because of the circumstantial nature of the evidence in this case and the prosecutor's emphasis on both the shaved pubic region as consciousness of guilt and the nine prior convictions, the errors in admitting this evidence were not harmless beyond a reasonable doubt. Therefore, I would grant Huggins a new trial.

Penalty-Phase Instructions and Interrogatories
Independent of my dissent from the affirmance of the convictions, I take this opportunity to commend the trial court for its actions during the penalty phase in submitting special interrogatories regarding the aggravating factors and instructing the jurors accordingly. The trial court instructed the jury as follows:
During your determination of the sentence, you will be required to answer several questions concerning statutory aggravating circumstances. These questions will be listed on the verdict form, which I will give you. If you find that the statutory aggravating circumstances exist, mark ... which particular aggravating circumstances have been proved beyond a reasonable doubt. And for each aggravating circumstance, ... indicate the number of the jurors' findings in the particular circumstance.
... During your determination of the sentence, you will be required to answer several questions concerning mitigating circumstances. Those questions will be listed on a verdict form, which I will give you. If you find the mitigating circumstances do exist, mark ... which particular mitigating circumstances have been established, and for each mitigating circumstance, indicate the number of the jurors finding that particular circumstance.
*777 The special verdict interrogatories read as follows:
 members of the Jury find beyond a reasonable doubt that [the specific aggravating circumstance applies];
 members of the Jury do not find beyond a reasonable doubt that [the specific aggravating circumstance applies].
...
 members of the Jury find that [specific circumstance] is a mitigating factor.
 members of the Jury do not find that [specific circumstance] is a mitigating factor.
The jurors found each aggravator by a unanimous vote, satisfying not only the Sixth Amendment requirements of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), but also the right to a unanimous verdict on aggravators qualifying a first-degree murderer for the death penalty that I believe is required by article I, section 22 of the Florida Constitution. See Butler v. State, 842 So.2d 817, 838-29 (Fla.2003) (Pariente, J., dissenting).
As I have recently noted, various members of this Court have stated that specific interrogatories on the aggravating factors submitted to a jury are advisable following Ring. See Globe v. State, 877 So.2d 663, 679-80 (Fla.2004) (Pariente, J., specially concurring). The findings on the aggravators and the mitigators are not prohibited by section 921.141, Florida Statutes (2003). See Bottoson v. Moore, 833 So.2d 693, 723 (Fla.2002) (Pariente, J., concurring in result only).
In general, a jury finding on each aggravator eliminates the uncertainties of appellate review inherent in the "bare advisory recommendation" now required by the standard jury instructions. See Bottoson, 833 So.2d at 708 (Anstead, C.J., concurring in result only) (stating that it is impossible to tell from jury's death recommendation "which, if any, aggravating circumstances a jury or any individual juror may have determined existed"). As I stated in my concurring opinion in Bottoson:
By requiring a special verdict on aggravating circumstances, this Court will not only assist trial judges in administering section 921.141, but also enhance the quality of our own constitutionally mandated review of death sentences in a manner that anticipates the likely effect of Ring and its progeny. First, the special verdict would serve to facilitate our determination of harmless error during appellate review. Second, the additional procedure would assist in the jury override situation because this Court would know whether the jury's life recommendation was based on a finding of no aggravators or on a determination that the mitigators outweighed the aggravators. Finally, a special verdict form would help to ensure that this Court does not run afoul of the Eighth Amendment by affirming a death sentence based on an invalid aggravator  i.e. in this context, an aggravator not properly found by the jury.
833 So.2d at 724 (footnote omitted).
The trial court in this case is to be lauded for taking this step in a penalty phase conducted shortly after the decision in Ring. The instructions and verdict form demonstrate how simple it is to comply with the spirit of Ring without deviating from our statutory scheme. I encourage other trial judges to similarly obtain specific jury findings on the proposed aggravators at the conclusion of the penalty phase of each capital trial.
ANSTEAD, J., concurs.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] In that order, the trial court found the following. On June 16, 1997, Preston Ausley contacted Detective Daniel Nazarchuk of the Orange County Sheriff's Office with information regarding the Larson case. Ausley told Detective Nazarchuk that a white Ford Explorer cut him off in traffic in Orlando, that he had written down the tag number, and that he had verified within one digit that the license plate number was the same as that of Larson's Ford Explorer. Detective Nazarchuk's notes from this conversation indicated that the date of the sighting was June 12, 1997, and that Ausley said he saw a white male driving the vehicle. However, at the evidentiary hearing, Ausley claimed that he told Detective Nazarchuk that the individual he saw driving the vehicle was a white female in her late twenties to early thirties with blonde hair that was just below shoulder length and that he encountered the vehicle on June 11, 1997. Lead sheet 302 was created from Detective Nazarchuk's notes of the conversation with Ausley and was provided to the defense during discovery.

During Huggins' first trial, Ausley saw Huggins' former wife, Angel Huggins, on the television coverage of Huggins' trial. On February 1, 1999, the day after seeing Angel Huggins, Ausley went to the Office of the State Attorney. He was directed to Assistant State Attorney Dorothy Sedgwick, who spoke with him briefly and asked Pat Guice, an investigator with the State Attorney's office, to take his tape-recorded statement. In that statement, Ausley stated that when he saw Angel on television, it had struck him that she resembled the driver of the white Ford Explorer he had seen. Guice then requested that Ausley return the next day so that the state attorneys who were at that time prosecuting the Huggins case in Jacksonville could speak with him. The next morning, Assistant State Attorney Jeff Ashton spoke to Ausley on the telephone. After their conversation, Ashton determined that Ausley's name had been given to Huggins in lead sheet 302, Ausley's statement did not support what he believed the defense's theory of the case would be, and Ausley's statement was of little value. Ashton attended trial that day and did not disclose to the trial court or the defense counsel that he had been contacted by Ausley.
[3] Although not revealed at Huggins' second trial, it appears that Huggins began a relationship with Angel's sister, Tammy, sometime during this period. On June 27, 1997, they left Florida together. Shortly thereafter, Angel saw a television program, America's Most Wanted, which featured Larson's murder. The search of her mother's house resulted from Angel reporting to police that she suspected her husband of the murder.
[4] On cross-examination, Smith testified that he had known Angel as Huggins' wife and because she had been roommates with Smith's girlfriend at one time. Smith also testified that he saw Angel on June 15, 1997, when she came to his home to pick up some marijuana.
[5] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[6] Spencer v. State, 615 So.2d 688 (Fla.1993).
[7] In her dissent, Justice Pariente questions whether the admission of Huggins' prior record is authorized by section 90.806. She quotes the second sentence of that section and suggests that Huggins' prior record should not have been admitted because it does not constitute "[e]vidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement." However, the first sentence of that section provides that a hearsay declarant's credibility may be attacked "by any evidence that would be admissible ... if the declarant had testified as a witness." That provision clearly implicates the application of section 90.610, which allows the admission of prior convictions of certain crimes to attack the credibility of a witness.
[8] In his reply brief to this Court, Huggins conceded that section 90.803(3) allows the admission of a declarant's statement of intent to support an inference of the future act of the declarant but further argued that neither the State nor the trial court relied on that basis at trial. The record indicates that the trial court required no argument from the State on this issue, and defense counsel failed to request clarification of the grounds for the court's ruling. Clearly, the trial court found this to be a straightforward matter requiring no further elaboration.
[9] Williams v. State, 110 So.2d 654 (Fla.1959).
[10] Aside from what was contained in Huggins' original notice and limited pretrial arguments heard on July 9, 2002, Huggins failed to file a written proffer or orally present further information regarding the Rewis evidence until after the close of the evidentiary portion of trial. On July 25, 2002, a day after the defense rested, Huggins filed a written proffer of the Rewis evidence. The court permitted the filing, noting that the prior ruling would stand and the filing would be treated as a proffer of what Huggins would have presented had the ruling been otherwise.
[11] See supra note 2.
[12] Spencer v. State, 615 So.2d 688 (Fla.1993).
[13] On a case-by-case basis, specific or actual prejudice will not be required where the appearance of impropriety is strong. For example, this Court has held that a pretrial motion to disqualify a prosecutor who previously defended the defendant in any criminal matter that involved or likely involved confidential communications with the same client should be granted. See Reaves v. State, 574 So.2d 105, 107 (Fla.1991). As well, this Court has held that personal assistance to the prosecution by a defendant's prior counsel created a sufficient appearance of impropriety to warrant a disqualification. See Castro v. State, 597 So.2d 259, 260-61 (Fla.1992). However, the present case does not resemble either of these circumstances.
[14] Huggins argues that the sequence of events leading to the victim's death are unknown, that the evidence does not preclude the possibility that he acted without premeditation, and that this Court cannot rule out the hypothesis that Larson met Huggins at the Publix and willingly accompanied him from there.
[15] Crab lice, also known as pubic lice, do not infest the scalp. Centers for Disease Control, Fact Sheet  Pubic Lice Infestation, at http:// www.cdc.gov/ncidod/dpd/parasites/lice/factsht  pubic  lice.htm (visited Nov. 30, 2004).