# Supreme Court of Florida

_____

No. SC11-219
_____

**JOHN STEVEN HUGGINS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC12-2161
_____

**JOHN STEVEN HUGGINS,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[October 9, 2014]

PER CURIAM.

John Steven Huggins appeals an order of the circuit court denying his

motion to vacate his conviction of first-degree murder and sentence of death filed

under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ

of habeas corpus. We have jurisdiction. <u>See</u> art. V, § 3(b)(1), (9), Fla. Const. For the following reasons, we affirm the denial of Huggins' motion and deny his petition for a writ of habeas corpus.

## OVERVIEW

Huggins was convicted of the June 1997 murder of Carla Larson and sentenced to death. After discovering that the State committed a <u>Brady</u>[1] violation, the trial court ordered a new trial. At Huggins' second trial, he was again convicted of murder and sentenced to death. This Court affirmed his conviction and sentence on direct appeal. Huggins filed the instant postconviction motion on June 5, 2006. Subsequently, the postconviction court found Huggins was incompetent to proceed and he was committed to the Department of Children and Family Services (DCF) for treatment. The court monitored Huggins' progress until ultimately determining that Huggins was competent to proceed with his postconviction proceedings. Huggins moved through counsel for an additional competency determination, but refused to cooperate. The postconviction court held an evidentiary hearing without first determining Huggins' competency. After the evidentiary hearing, the court ordered Huggins to meet with experts, then ruled that Huggins was competent and denied Huggins' postconviction motion. Huggins now appeals that denial and petitions this Court for a writ of habeas corpus. We

---

1. <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

find that the postconviction court did not err and that Huggins has not established that he is entitled to a writ of habeas corpus.

## STATEMENT OF THE CASE AND FACTS

Huggins was first convicted of Larson's murder on February 3, 1998. After finding that the State had committed a Brady violation, the trial court ordered a new trial. State v. Huggins, 788 So. 2d 238, 244 (Fla. 2001). The facts presented in Huggins' second direct appeal were as follows:

> The victim, Carla Larson, was married and had a daughter. She was an engineer for Centex–Rooney, a construction company, and was working on Disney's Coronado Springs project in June 1997. She drove a white Ford Explorer with a black bug guard on the front, light blue pinstripes, a Passport radar detector hard-wired to the dash, and air conditioning and radio controls in the back seat. On the morning of June 10, 1997, Larson took her daughter to day care and went to work. Just prior to lunch, Larson told a co-worker, Cindy Garris, that she was going to a grocery store to pick up food for an afternoon meeting. Garris suggested that she go to a new Publix grocery store on International Drive, just off of the Osceola Parkway, and Larson indicated that she would go there. Larson left work at approximately noon. A Publix receipt indicated that she purchased food at 12:11 p.m. However, Larson never returned to work.
>    Numerous witnesses testified to various sightings that afternoon of a white sport utility vehicle (SUV) on a dirt road off of the Osceola Parkway that led into a wooded area. Between 12:30 and 12:45 p.m., Barry O'Hearn and his landscaping crew were eating lunch in that wooded area when O'Hearn saw a white Ford Explorer drive past him on a dirt road. He could only describe the driver as white. Between 12:45 and 1 p.m., Floyd Sparks, Disney's superintendent of drainage and roadways in the area, was driving on the Osceola Parkway and saw, through a fire break line in the woods, that an SUV was parked in an unauthorized area of the woods. Though normally part of his job, Sparks was not able to investigate it at that time. Gary and Brad Wilson, a father and son who both worked for Centex–Rooney, were

- 3 -

returning from lunch on the Osceola Parkway just prior to 1 p.m. when they saw a white Ford Explorer exit from the dirt road onto the Osceola Parkway at an unusually high rate of speed. Their vehicle soon passed the Ford Explorer, and both looked at the driver. Brad Wilson later told a sketch artist that the driver was a white male with a dark tan, weathering of the face, highlights in his hair, and a moustache and beard. He testified at trial that the driver had longer, brownish hair and described his facial hair as a close growth. Gary Wilson, however, described the driver as a white male who was flushed in the face, had medium-length dark hair, and no facial hair. Finally, between 2:30 and 3 p.m., Chris Smithson, a subcontractor on the Coronado Springs project, saw a white Ford Explorer exit from the dirt road, partially cross the Osceola Parkway, stop in the median and wait to merge with on-coming traffic. Smithson noticed the vehicle because it was nice and seemed out of place in the woods. Smithson later saw Huggins in the median and identified him as the driver of that vehicle.

Two days after Larson's disappearance, two of her co-workers instituted a search. They encountered Sparks, who mentioned the SUV he had seen two days earlier. Sparks then went to the point on Osceola Parkway from where he had seen the SUV and, via hand-held radios, directed Larson's co-workers to the point where he could see them through the same fire break line. From there, they were led by smell to a body about 200 feet away. The body, which was naked and covered by a towel, was later identified as Larson. Dr. Shashi Gore, the medical examiner in this case, testified at trial that significant decomposition indicated the body had been there for approximately two days and concluded from his autopsy that death was by strangulation. Except for her wedding band, the jewelry Larson usually wore was missing, as was her clothing and purse. Months later, on December 24, 1997, a landscaping crew found Larson's purse in the brush off of the driver's side of a ramp along World Drive between the Osceola Parkway and Highway 192.

On the day of Larson's disappearance, Huggins and his wife, Angel, were visiting Orlando with their five children. Although Huggins and Angel were estranged, the family stayed together at a Days Inn on Highway 192 near the Osceola Parkway and International Drive on the evenings of June 8 and 9, 1997. At the trial, Huggins' sixteen-year-old son, Jonathon Huggins, testified that he could not remember much about the trip, which had occurred five years earlier.

The trial court found that Jonathon was effectively unavailable as a witness, and his prior deposition was admitted. In Jonathon's deposition, he stated that in the summer of 1997, his father did not have a car and the family visited Orlando in Angel's small car. On the day after visiting Gatorland, they returned to Angel's house without his father, and his father later returned in a different vehicle, which Jonathon remembered as being dark in color, new in appearance, with air vents and radio controls in the back seat, and a clean interior. Jonathon also remembered riding in that vehicle approximately three times and that later that summer, his father drove him back to Panasoffkee, where Jonathon lived with his grandmother, in a little blue car.

Angel Huggins' mother, Fay Blades, with whom Angel lived in Melbourne, testified that on June 10, 1997, she returned home from work a little after 5 p.m. and found an unfamiliar, white SUV in her carport. She saw Jonathon Huggins in the house but left shortly thereafter to attend night school. One of Blades' neighbors testified that she saw a white Ford Explorer at Blades' home on two consecutive days sometime around June 11, 1997. And a second neighbor testified that he once saw in Blades' driveway a white SUV and a similar vehicle that had been poorly spray-painted a dark grey or black color later the same week.

Kevin Smith, a friend of Huggins who worked in lawn maintenance and lived near Cocoa Beach, testified that on June 12, 1997, Huggins arrived at Smith's house in a white SUV that appeared new. It contained a radar detector hard-wired to the dash and may have had a "car bra" on the front and blue pinstripes. Huggins asked if he could park the vehicle at Smith's house. Two days later, Huggins returned, spoke with Smith for a while, and took the vehicle. Smith testified that sometime later, he found an unfamiliar radar detector in a box on top of his exterior water heater, realized its significance after being interviewed by police, initially threw it in a vacant lot, and ultimately showed the police where to find it. A police witness testified that it was a Passport radar detector.

Another witness, Charlotte Green, testified that sometime after she heard of Larson's murder, a white Ford Explorer that was partially spray-painted black cut in front of her at a high rate of speed in the Melbourne area. Two days later, she saw the same vehicle stopped along a fishing river in Cocoa Beach with all of its doors open and a man standing at the back hatch. Green further testified that she saw

the burned remains of a vehicle in the same location the following day.  After seeing Huggins on a television report, Green identified him as the driver.

At 11:23 p.m. on June 26, 1997, the police received a call that a truck was burning on a vacant lot in Cocoa Beach.  An investigation revealed that the truck was the victim's Ford Explorer.  The arson investigator testified to the presence of a fire accelerant and white paint partially covered with black paint.  Over-spray on the tires indicated the black paint had not been professionally applied.

In late June and July, 1997, police conducted three searches of Blades' house and a shed on her property, but no incriminating evidence was found.  However, Blades testified that her curiosity led her to conduct her own search.  As part of that search, she unscrewed the cover of an electrical box within her shed and discovered jewelry wrapped in some paper.  Blades turned the jewelry over to police, and Larson's husband later identified it as Larson's missing jewelry.

Huggins v. State, 889 So. 2d 743, 750-52 (Fla. 2004) (footnote omitted).

On June 5, 2006, Huggins filed a postconviction motion, raising four claims.[2]  Subsequently, Huggins filed a motion for competency determination.  The competency proceedings are discussed below.  After the postconviction court found Huggins incompetent to proceed, the postconviction proceedings were delayed.

Ultimately, the postconviction court held an evidentiary hearing on Huggins' postconviction motion on August 23-26, 2010.  After the hearing and subsequent competency determination, the court issued an order denying each of Huggins' claims.  This appeal follows, in which Huggins raises five claims, including that

2.  1. Ineffective assistance of counsel; 2. Giglio violation; 3. Brady violation; and 4. improper shackling.

- 6 -

the postconviction court improperly found him competent to proceed and improperly held the evidentiary hearing without first determining his competency. Huggins has also filed a petition for a writ of habeas corpus.

## DISCUSSION

### Competency Proceedings

In his first and second issues on appeal, Huggins argues that he was incompetent to proceed with his postconviction proceedings. He first alleges that the postconviction court improperly found him competent to proceed. Secondly, he alleges that the court should have held competency proceedings prior to the evidentiary hearing—or postponed the evidentiary hearing until a competency determination could take place. We disagree. Huggins' refusal to cooperate with the court-appointed experts caused the delay in the competency proceedings. Accordingly, the postconviction court did not err by postponing the competency hearing until after the evidentiary hearing and ultimately finding Huggins competent to proceed.

### History of Competency Proceedings

On November 27, 2006, the postconviction court held an initial hearing to determine Huggins' competency. The court received reports and testimony from Drs. Henry Dee, Harry McClaren, and Jeffrey Danzinger. The court issued an

order finding Huggins incompetent to proceed and committed him to DCF pursuant to section 916.13(1), Florida Statutes (2006).

The court held a status hearing on June 6, 2007, and heard testimony from Drs. Jorge Villalba, Joe Thornton, Myron Bilak, Chuck Blessington, and Robert Berland. The court held another status hearing on August 15, 2007. Huggins was returned to commitment to continue attempts at treatment. The court ordered Huggins be re-evaluated for competency on October 17, 2007, and held a status hearing on November 28, 2007. On January 25, 2008, Huggins received his second competency hearing. The court heard testimony and received reports from Drs. Dee, McClaren, Danzinger, and Thornton. The court issued its order finding Huggins incompetent to proceed on January 28, 2008.

On May 2, 2008, the court held a status hearing to determine whether Huggins was cooperating with his treatment plan. On May 5, 2008, the court found Huggins incompetent to proceed and ordered Huggins committed to a Florida Department of Corrections (DOC) facility. On May 4, 2009, the court entered a second amended order transferring Huggins back to DCF.

On September 18, 2009, DCF alerted the court that it had determined Huggins was competent to proceed and no longer met the criteria for involuntary commitment. The report was filed by Dr. Stephen Kopetskie.

On October 9, 2009, Huggins filed an Emergency Motion for Competency Evaluations. The court held a competency hearing on October 15, 2009, and denied Huggins' motion, relying on Dr. Kopetskie's determination that Huggins was competent, but unwilling, to proceed. Huggins was discharged from the hospital on October 15, 2009, and on October 16, 2009, the court issued its order finding Huggins competent to proceed.

Huggins filed his most recent motion for competency determination on July 1, 2010, which was granted. The competency hearing was delayed, however, because Huggins reportedly refused to participate, not wanting to be found incompetent. After the evidentiary hearing, the court issued an order compelling Huggins to meet with the appointed experts. Thereafter, the court issued its order denying postconviction relief and finding Huggins competent on November 18, 2010.

## Standard of Review for Competency

Under the Due Process Clause of the Fourteenth Amendment, a defendant may not be tried and convicted of a crime if he is not competent to stand trial. See U.S. Const., amend XIV, § 1. "It is well-settled that a criminal prosecution may not move forward at any material stage of a criminal proceeding against a defendant who is incompetent to proceed." Caraballo v. State, 39 So. 3d 1234, 1252 (Fla. 2010) (citing Medina v. California, 505 U.S. 437, 439 (1992)). In order

- 9 -

to determine whether a defendant is competent to proceed in postconviction proceedings, the court must discern "whether he has sufficient present ability to consult with counsel with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the pending collateral proceedings." Alston v. State, 894 So. 2d 46, 54 (Fla. 2004) (quoting Hardy v. State, 716 So. 2d 761, 763 (Fla. 1998)). The test for determining whether a defendant is competent to proceed at trial is identical. See Peede v. State, 955 So. 2d 480, 488 (Fla. 2007) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)) (holding that the trial court must decide whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him"). Moreover, when analyzing a competency at trial issue in postconviction proceedings, a court must determine "(1) whether the court could make a meaningful retrospective evaluation of the defendant's competence at the time of trial; and, if so, (2) whether the defendant was in fact competent at the time of trial." Lawrence v. State, 969 So. 2d 294, 304 (Fla. 2007) (quoting Jones v. State, 740 So. 2d 520, 523 (Fla. 1999)).

In arriving at a conclusion as to the defendant's competency, the court should consider several factors, including "the defendant's appreciation of the charges and the range and nature of possible penalties; the ability to assist one's

- 10 -

attorney and disclose relevant facts surrounding the alleged offense; the ability to manifest appropriate courtroom behavior; and the capacity to testify relevantly." Id. Finally, when analyzing a competency determination on appeal, this Court applies the competent, substantial evidence standard of review. In other words, a trial court's determination of competency supported by competent, substantial evidence will not be disturbed on appeal. See Hernandez-Alberto v. State, 889 So. 2d 721, 727 (Fla. 2004).

When expert testimony regarding a defendant's competency conflicts, this Court has traditionally afforded great deference to the trial court's resolution of that conflict:

> "It is the duty of the trial court to determine what weight should be given to conflicting testimony." Mason v. State, 597 So. 2d 776, 779 (Fla. 1992). "The reports of experts are 'merely advisory to the [trial court], which itself retains the responsibility of the decision.' " Hunter v. State, 660 So. 2d 244, 247 (Fla. 1995) (quoting Muhammad v. State, 494 So. 2d 969, 973 (Fla. 1986)). Thus, when the experts' reports or testimony conflict regarding competency to proceed, it is the trial court's responsibility to consider all the relevant evidence and resolve such factual disputes. See, e.g., Hardy v. [v. State], 716 So. 2d [716,] 764 [(Fla. 1998)] (citing Hunter, 660 So. 2d at 247).
> "Where there is sufficient evidence to support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge." Mason, 597 So. 2d at 779. A trial court's decision regarding competency will stand absent a showing of abuse of discretion. See, e.g., Hardy, 716 So. 2d at 764; Carter v. State, 576 So. 2d 1291, 1292 (Fla. 1989). Thus, the issue to be addressed by this Court is whether the circuit court abused its discretion in finding [the defendant] competent to proceed [at trial]. In addressing that issue, [this Court remains] mindful that a trial court's decision does not constitute an abuse of discretion "unless no reasonable person would

take the view adopted by the trial court." Scott v. State, 717 So. 2d 908, 911 (Fla. 1998).

Peede, 955 So. 2d at 488-89 (quoting Alston, 894 So. 2d at 54); see also Hernandez-Alberto, 889 So. 2d at 726; Fla. R. Crim. P. 3.211. To that end, where there is evidentiary support in the record for the trial court's resolution of conflicting expert testimony, this Court will not disturb the trial court's competency determination. Hernandez-Alberto, 889 So. 2d at 727-28. Where experts conflict, it is the function of the trial court to resolve the dispute. Evans v. State, 800 So. 2d 182, 188 (Fla. 2001). Even though conflicting evidence on an issue exists, this Court will not disturb the trial court's resolution of that conflict if it is supported by competent, substantial evidence. See Hernandez-Alberto, 889 So. 2d at 727; Gore v. State, 24 So. 3d 1, 10 (Fla. 2009) (relying, in part, on the fact that the trial court "also observed Gore's behavior first-hand" to conclude that the court did no err in finding Gore competent to proceed in his postconviction proceedings); Evans, 800 So. 2d at 188 (relying, in part, on the fact that "the trial judge had ample opportunity to observe Evans in the courtroom" to conclude that the trial court did not abuse its discretion in finding Evans competent to stand trial).

**Merits**

The postconviction court found Huggins incompetent to proceed several times over the course of his postconviction proceedings. Each time, the court

- 12 -

ordered Huggins be committed and to submit to treatment. While the experts all agreed that Huggins likely suffered from a form of delusional behavior, the experts did not agree on the best method of treating Huggins' symptoms. The record indicates that despite repeated efforts, Huggins refused any medication and refused to cooperate with staff. No expert believed that Huggins met the criteria to be forcefully medicated because it was unclear whether his particular illness would respond to pharmacology.

Dr. Kopetskie was the most recent expert to interact with Huggins and his opinion, after he and his team met with Huggins on a daily basis, was that Huggins was malingering and refusing to cooperate in order to prolong his proceedings. Given the evidence and the applicable standard of review, there is competent, substantial evidence to support the trial court's resolution of the conflicting evidence. Furthermore, the postconviction court did not abuse its discretion in finding Huggins competent to proceed because a reasonable person could take the view adopted by the postconviction court. See, e.g., Alston, 894 So. 2d at 54 ("[A] trial court's decision does not constitute an abuse of discretion unless no reasonable person would take the view adopted by the trial court." (quotation marks omitted)); cf. Gore, 24 So. 3d at 10 (concluding that trial court did not err in finding Gore competent to proceed in postconviction proceedings based on the following evidence: one expert opined that Gore was incompetent; two other

- 13 -

experts testified that Gore was competent; the trial court observed Gore's behavior first-hand; and the trial court had the benefit of the record from Gore's prior competency proceedings at trial in that case as well as a collateral case).

**Ineffective Assistance of Counsel**

Huggins raises multiple instances of ineffective assistance of counsel in both the guilt and penalty phases. After an evidentiary hearing, the postconviction court denied each of Huggins' claims. As to the guilt phase claims, we find that Huggins has failed to establish both prongs of the Strickland v. Washington, 466 U.S. 668 (1984), standard. As it relates to the penalty phase claims, because Huggins represented himself during the penalty phase, Huggins cannot claim ineffective assistance of counsel. Accordingly, for the reasons that follow, we affirm the postconviction court's order.

### Standard of Review

In accordance with Strickland, this Court employs the following standard of review:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Long v. State, 118 So. 3d 798, 805 (Fla. 2013) (quoting Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010)). Additionally,

There is a strong presumption that trial counsel's performance was not deficient. See Strickland, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Furthermore, where this Court previously has rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument. Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992).

In demonstrating prejudice, the defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Long, 118 So. 2d at 805-06 (parallel citations omitted).

Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

Shellito v. State, 121 So. 3d 445, 451 (Fla. 2013) (citing Mungin v. State, 79 So. 3d 726, 737 (Fla. 2011); Sochor v. State, 883 So. 2d 766, 771–72 (Fla. 2004)).

A. Alternative Suspect

Huggins' first subclaim is that counsel was ineffective for failing to introduce evidence that John Ricker was the killer. Ricker discovered Larson's body in an area previously searched by police, and had some unaccounted time during which he could have committed the murder. Furthermore, Ricker had a previous sexual battery charge that should have been introduced as "reverse Williams rule" evidence. The postconviction court found that the "reverse Williams" evidence was not sufficiently similar and that Ricker was not a viable alternative suspect. There was no reasonable probability that the outcome would have been different and our confidence in the outcome has not been undermined.

The court's conclusions are supported by the record. Ricker was in the company of two coworkers when they saw Larson pass them on her way to lunch, and they remained in each other's company until returning to work. Additionally, on direct appeal, we determined that the "reverse Williams" evidence was too dissimilar. Huggins, 889 So. 2d at 763. There is no credible evidence to show that counsel could have presented at trial that Ricker had an opportunity to murder Larson. Additionally, counsel's belief that the defense did not want to appear to be "attacking everybody" as a potential suspect is a reasonable tactical decision.

B. Consciousness of Guilt

Huggins' second subclaim is that counsel was ineffective for improperly handling Thornton's testimony. The postconviction court found counsel deficient, but found that the deficiency did not prejudice Huggins. We agree.

On direct appeal, Huggins raised the issue of the hearsay testimony elicited by counsel, arguing that the trial court improperly admitted the evidence. This Court found that the "facts provide[d] a sufficient nexus upon which the trial court could base its exercise of discretion in admitting this evidence." Huggins, 889 So. 2d at 755. Because Huggins has only attacked the consciousness of guilt evidence and not the prior convictions that also came in with this line of questioning, we find that Huggins has failed to establish that he was prejudiced by counsel's deficiency.

C. Reasonable Doubt

Huggins' third subclaim is that counsel failed to present testimony from several witnesses who would have raised reasonable doubt. The postconviction court found that none of the eight witnesses would have changed the outcome of the trial. Specifically, the court found that Huggins failed to present evidence why Brandell, Angel, Johnathon, and Mansfield should have been called as witnesses; that Ausley would have been impeached with inconsistent statements; that Manning would have been contradicted by Larson's coworkers; that Kronfield

- 17 -

would have been cumulative to other impeachment testimony; and that counsel had a reasonable strategic reason not to call Creighton because she had an affair with Huggins and had reconciled with her sister prior to his trial. The postconviction court's findings on this issue are supported by competent, substantial evidence and our confidence in the outcome has not been undermined.

D. Failure to Challenge the State's Case

Huggins' fourth subclaim is that counsel failed to properly challenge the State's case. Specifically, he argues that counsel should have challenged Christopher Smithson, Charlotte Green, Kevin Smith, Charles Lacorte, Dr. Sashi Gore, the reward money paid to Angel Huggins, the jewelry found in the shed, and his own testimony. The postconviction court denied relief on this subclaim.

The court found that impeaching Smithson's testimony about barricades and his ability to see what he claimed to have seen would not likely have cast doubt on his identification of Huggins as the drive of the SUV. Likewise, the court found that Green was thoroughly impeached at trial and additional impeachment would not have made a difference. The postconviction court also found that Huggins failed to meet his burden of proof for ineffective assistance of counsel for failure to present Smith as a potential suspect because he failed to ask questions relating to this claim during the evidentiary hearing. Further, the court noted that this Court found there was competent, substantial evidence inconsistent with the defense

theory that Smith was the killer.  See Huggins, 889 So. 2d at 766-67.  Likewise, the court found that Huggins failed to present testimony during the evidentiary hearing to explain why Lacorte's testimony should have been challenged and found that it does not require a paint expert to characterize a paint job as "unprofessional."  The court also found that Huggins failed to present evidence why counsel should have challenged Dr. Gore's testimony and noted that counsel filed a motion in limine regarding his testimony, which was denied.  Huggins also failed to present evidence demonstrating why counsel should have raised the issue regarding reward money paid to Angel Huggins or the jewelry found in the shed.  Lastly, Huggins did not allege that he told counsel that he wanted to testify nor did he provide the specific testimony he would have given.  The postconviction court's findings are supported by competent, substantial evidence.

E.  Penalty Phase Ineffectiveness

Huggins also argues that counsel was ineffective for failing to investigate mental mitigation to present in his case and that the mental health expert retained was not provided with all available records.  Accordingly, Huggins argues that he could not have made a well-informed decision to act as his own counsel during the penalty phase.  The postconviction court reviewed Robert Wesley's testimony and determined that Wesley was "thoroughly prepared" and that it was Huggins' direction not to put on a substantial penalty phase presentation.  Because Huggins

- 19 -

has repeatedly insisted that counsel not argue that he is incompetent or incapacitated in any way, and has attempted to fire counsel every time his competency has been raised, the postconviction court's ruling here is correct.

F.  Cumulative Effect

Last, Huggins asks this Court to consider the cumulative effect of his claims. Because we have determined that relief is not warranted on any of these claims, a claim of cumulative effect is likewise without merit.

**Prosecutorial Misconduct**

Huggins argues that the State knowingly presented a false argument during its closing in violation of Giglio v. United States, 405 U.S. 150 (1972).  Huggins' claim fails because it should have been raised on direct appeal and because the prosecutor's alleged improper argument is not cognizable under Giglio. Accordingly, the postconviction court properly denied this claim.

To successfully raise a claim under Giglio, Huggins must demonstrate that (1) the testimony was false; (2) the prosecutor knew it was false; and (3) the testimony was material.  See Conahan, 118 So. 3d at 728 (citing Guzman v. State, 868 So. 2d 498, 505 (Fla. 2003)).  If Huggins successfully demonstrates the first two elements, "the State bears the burden of proving that the testimony was not material by showing that there is no reasonable possibility that it could have affected the verdict because it was harmless beyond a reasonable doubt."  Id.

(citing <u>Johnson v. State</u>, 44 So. 3d 51, 64-65 (Fla. 2010); <u>Guzman</u>, 868 So. 2d at 506-07). And, the claim carries the same mixed standard of review. <u>Id.</u> at 729 (citing <u>Suggs v. State</u>, 923 So. 2d 419, 426 (Fla. 2005)).

Huggins maintains that the prosecutor argued that Charlotte Green, a witness at trial, had no way of knowing that the car had been spray-painted black other than by seeing it. Huggins alleges that the State caused the information about the unprofessional paint job to be released to the media in order to find a witness who had seen it. Accordingly, Huggins argues, Green could have become aware of the paint job through the media. Green acknowledged that she heard about the case in the media, but also insisted that she personally saw a white Ford Explorer that had been partially spray-painted black. Below, the postconviction court found that Huggins could not establish that Green's testimony was false or that the prosecutor knowingly made a false statement. Because Huggins cannot establish that the State knowingly presented false testimony, his argument fails. Further, Huggins' argument is based on the prosecutor's argument and not Green's testimony. Because Huggins' argument is really one of improper argument, it should have been raised on direct appeal and is procedurally barred. <u>See</u> <u>Johnson v. State</u>, 104 So. 3d 1010, 1027 (Fla. 2012); <u>Teffeteller v. Dugger</u>, 734 So. 2d 1009, 1016 (Fla. 1999); <u>see also</u> <u>Smith v. State</u>, 445 So. 2d 323, 325 (Fla. 1983) ("Issues which

either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").

## **Brady** **Violation**

Huggins does not raise an actual claim in this issue. Instead he states that he does not "waive" this claim should he one day be able to provide input to establish it. Because Huggins does not actually present an argument on appeal, this claim fails. Because Huggins has failed to allege or establish any of the required elements, the postconviction court properly denied this claim.

## Leg Brace

In this claim, Huggins alleges that counsel was ineffective during the guilt and penalty phases for failing to object to the trial court's decision requiring Huggins to wear a leg brace. Huggins' claim fails for several reasons. First, a shackling claim could and should have been raised on direct appeal. Second, because Huggins served as his own penalty phase counsel, he cannot claim ineffective assistance of counsel during the penalty phase. Third, because the record demonstrates that Huggins wore a leg brace that was not visible to the jury during the 2002 penalty phase, based on the finding of the trial judge that his behavior warranted the need, even if counsel had raised the issue, it would have been found to be without merit.

The postconviction court denied this claim, stating:

On August 25, 2010, Mr. Wesley testified that he remembered a restraint being used at the trial in Jacksonville [the 1999 trial]. He described it in detail as in a hinged metal brace with belted fasteners and a spring-loaded pin that could lock the knee in place. However, he did not remember a brace being used in Tampa [the 2002 trial] and also did not remember Mr. Huggins complaining about it, although he did not have a present recollection of either.

Mr. Huggins did not present any evidence or testimony to support the claim that he was shackled during the guilt phase of the 2002 trial. Therefore, the Court finds that he has failed to meet his burden of proof. Furthermore, the nature and extent of the 17-page argument set forth in the instant motion indicated that he was actually challenging the trial court's denial of his pro se request to remove whatever shackle he might have been wearing rather than counsel's purported failure to object. Such a claim is procedurally barred because it could have been raised on direct appeal. Floyd v. State, 18 So. 3d 432, 457 (Fla. 2009).

The record indicates that Huggins made a verbal request in open court to remove his leg brace once he began representing himself sometime before the penalty phase commenced, which was denied.

The Court: Okay. Anything else, Mr. Huggins?

Defendant: The leg brace.

The Court: Uh-huh.

Defendant: I would move that the court allow me to be in front of the jury unrestrained.

The Court: No, sir. The reasons behind it, Mr. Huggins, you are currently serving how much life sentences?

Defendant: A few. Two or four.

The Court: Okay. At least more than two. How many more than two, I don't exactly know.

Defendant: Neither do I, Judge.

The Court:  The second thing is, your involvement with Mr. Lebron and some other gentlemen at the Osceola County Jail, and presuming that we will be in a penalty phase, you will stand convicted of a crime of murder in the first degree, where the ultimate penalty is death.  So I don't think the leg brace at this time in point presents any unusual restraint on you.  You're not shackled.  It is not visible to the jury.  The only thing that I will do is I will have the podium stationed, and everybody will have to work from the podium, including the State.  So everybody will speak from the podium.  But that request of the removal of the leg brace will be denied for those particular reasons.

Defendant:  Yes, sir.

The Court:  Anything else?

Defendant: No, sir.

The record is silent as to exactly which day this occurred except that the transcript is labeled July 15-26, 2002.  Huggins asserts that this conversation was held during jury deliberations at the end of the guilt phase.  The context of the discussions and their placement in the record supports the conclusion that it was before the penalty phase commenced, but is otherwise unclear.  Huggins raised the issue again the following day:

Defendant:  Yesterday, I did an oral motion with you about the leg restraint.  Today I'd like to do a second oral motion about the leg restraint.

The Court:  You may proceed.

Defendant:  I have a case, which is United States versus Jeffrey Scott Durham.  I only have one copy.  Basically, what the case states is that Mr. Durham was in the same circumstances that I am in before the court, with rumors, innuendos of escape attempts or what have you, and Mr. Durham was required to wear restraints during his trial.  The judge gave basically the same reasons that you gave yesterday, why

you want me to wear this restraint. What I need to say is that wearing this leg brace is going to prejudice me before the jury, I believe. It is also going to interfere with my thought process in presenting my mitigation before the jury. And I would ask again at this time – if you would like to read Durham – that you grant – that I be unrestrained before the jury.

The Court: Comments from the State of Florida?

Mr. Ashton: If I may look at the Durham case. Thank you.

The Court: Mr. Huggins, do you recall what type of restraint was used in the Durham case?

Defendant: Yes, sir. Leg shackles and also the electric stun belt.

The Court: Okay.

Mr. Ashton: Your Honor, I believe the case is distinguishable in that the restraints that are used on Mr. Huggins are not visible restraints in any way. Also, the situation here is different because this jury has already convicted Mr. Huggins of first degree murder, so there is – there isn't the same impact on his presumption of innocence. There is no presumption that applies in this phase. He is, in fact, presumed to be guilty of murder in the first degree. Also, as the court indicated, Mr. Huggins is presently serving multiple life sentences, and we have rumors of difficulties in the Osceola County Jail – in fact, there are reports that the court is aware of, Mr. Huggins is aware of, of a razor blade potentially fashioned into a weapon found in his cell. And I believe that that gives the court sufficient basis to use a very, very subtle invisible restraint system in order to secure the safety of all persons present.

Defendant: May I respond?

The Court: Yes, sir.

Defendant: Judge, I briefly will address the razor blade issue. That was found in Mr. Lebron's cell, not my cell. The hole that was cut in the wall was found in another cell beside me. Not in my cell. I think Mr. Lebron and I got involved in that story because we were ex death row inmates. We had no holes in the wall in our cell. Neither one of

us, to my knowledge, I don't think Mr. Lebron has been charged with attempted escape. I certainly haven't. I think if I had been involved substantially, I would have been charged. But the State says the subtle restraint. This leg brace pops and cracks every time I get up, sit down, when I walk. It causes me to walk stiff legged. The jury is going to see it. They are going to know what it is. But more than that, it's how it affects my thought process while delivering mitigation before this jury. That is, deciding whether I live or die. In Mr. Durham's case, he jumped over a fence here in Tampa, same jail that I am in, and tried to take a shotgun from the guard. He had a handcuff key, removed the shackles from his feet. I am not in the same class. But yet the appellate court sent Mr. Durham back for a new trial. So I rely on Durham.

The Court: The court will note the following for the record. Mr. Huggins has been convicted of a felony in excess of nine times. He is currently serving at least six life sentences. He has been convicted by this jury of crimes of murder in the first degree, kidnapping, carjacking, and petit theft. He faces the ultimate penalty, which is death. As to any prejudice that may come from a hidden leg brace, if any, because they can't see it, I haven't heard it clicking, but it is quite evident through the testimony that was brought out during the Defendant's case that Mr. Huggins has been incarcerated since this time. And jurors, if they live in this world, know nine times out of ten that people who are accused on first degree murder are rarely granted bail. Some of them who are granted bail of a first degree murder case, there being outcry throughout the community. As far as your thought processes are concerned, I will note that you gave a well-reasoned logical argument. You have given argument that is as logical as most lawyers that appear before me. Not quite as elegant as Mr. Wesley, but you have given a well-reasoned argument. You cited case law. You have had the wherewithal this morning to renew all previous motions prior to the penalty phase. So if that leg brace is affecting your thinking [it is] in a positive manner. Therefore, your renewed request to have the leg brace removed will be denied.

Defendant: Yes, sir.

The Court: The Court will also note that the facility that we're in has numerous exits, unlike the other facilities, i.e., the Orange County Courthouse, or the Osceola County Courthouse, where one could not

easily get out of, this place has more exit points than most colanders have. . . .

It appears that Huggins also filed a pro se motion to remove the shackles on August 26, 2002. The record indicates that the trial court granted this motion in part, but does not reflect what was removed.

In his Motion to Vacate, Huggins alleged that he was deprived of his constitutional right to a fair trial under the Sixth Amendment by being forced to wear a leg brace during both the guilt and penalty phases of his trial. The postconviction court inexplicably addressed only the guilt phase portion of this claim, stating, "Mr. Huggins did not present any evidence or testimony to support the claim that he was shackled during the guilt phase of the 2002 trial." Nevertheless, the postconviction court was correct in its finding that Huggins did not present any evidence that he was restrained in the guilt phase of his trial and appears to concentrate his attack on the penalty phase portion of his trial. Because Huggins represented himself during the penalty phase of his trial, his claim that he received ineffective assistance of counsel for failing to object to his leg brace is without merit. Huggins himself moved repeatedly to have the leg brace removed, he therefore cannot claim that he did not receive effective assistance. See, e.g., Lamarca v. State, 931 So. 2d 838, 850 (Fla. 2006) ("Lamarca represented himself during the penalty phase; therefore, he cannot claim his trial counsel was deficient for decisions he made in conducting his defense during this phase.").

- 27 -

Instead, Huggins appears to be attacking the trial court's decision to deny Huggins' requests to remove the restraint. Because this type of claim should have been raised on direct appeal, it is procedurally barred.

Lastly, even if this claim were properly before this Court, it is without merit. Although shackling is "inherently prejudicial," visible shackles may be used when "justified by an essential state interest" specific to the defendant on trial. Deck v. Missouri, 544 U.S. 622, 624, 635 (2005); see also Knight v. State, 76 So. 3d 879, 886 (Fla. 2011). An inadvertent sighting of shackles is not sufficient to warrant a mistrial. See Knight, 76 So. 3d at 886-87. Further, this Court has affirmed a court's decision that the defendant's behavior required the use of shackles where the defendant had exhibited belligerent behavior, choked a jail sergeant, resisted an officer trying to transport him back to jail, and had fought with other inmates. See Johnston v. State, 27 So. 3d 11, 29 (Fla. 2010). We also noted in Johnston that, like here, the trial court rearranged the table so that Johnston's restraints were not visible to the jury. Id. Here, it is not clear that Huggins was "shackled." The trial court referred to the restraints as leg braces and specified that Huggins was not shackled. Additionally, the record indicates that the brace was not visible to the jury, and Huggins does not allege that any juror saw the brace. Finally, the record supports the trial court's finding that Huggins' behavior necessitated the use of the restraint. Accordingly, Huggins' underlying claim that he was improperly

- 28 -

shackled is without merit. For the foregoing reasons, the postconviction court properly denied this claim.

## HABEAS CLAIMS

**Ineffective Assistance of Appellate Counsel**

Huggins' first claim is a re-assertion of issue 3B in his postconviction appeal. As discussed above, we directly addressed this issue on direct appeal. Furthermore, appellate counsel argued that the trial court erred in admitting this evidence on direct appeal, which was rejected by this Court. See Huggins, 889 So. 2d at 753-57. Because Huggins cannot demonstrate that appellate counsel was ineffective, we deny this claim.

Huggins' second claim is a restatement of his fourth issue on appeal. As discussed above, Huggins cannot demonstrate that the State violated Giglio because the "evidence" in question is actually the prosecution's closing argument. See Wickham v. State, 124 So. 3d 841 (Fla. 2013) (finding that an alleged false statement during the prosecutor's closing argument was not material); Spencer v. State, 842 So. 2d 52, 70-71 (Fla. 2003) (finding no Giglio violation occurred where the prosecution was alleged to have misstated evidence during opening and closing arguments). Accordingly, we deny this claim.

However, to the extent that Huggins is arguing ineffective assistance of appellate counsel for failure to raise a claim of improper argument, this claim is properly raised in the instant habeas petition.

" 'In closing argument, counsel is permitted to review the evidence and fairly discuss and comment upon properly admitted testimony and logical inferences from that evidence.' Conahan v. State, 844 So. 2d 629, 640 (Fla. 2003). However, this Court has 'long held that argument on matters outside the evidence is improper.' Bigham v. State, 995 So. 2d 207, 214 (Fla. 2008)." King v. State, 130 So. 3d 676, 687 (Fla. 2013), cert. denied, 134 S. Ct. 1323 (2014). In order to preserve the issue of an improper argument for appellate review, "[c]ounsel must contemporaneously object to improper comments. . . . Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error." Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007).

First, it does not appear that the prosecutor's argument consisted of "matters outside the evidence." The prosecution argued that only an eyewitness would have been familiar with the "unprofessional" quality of the paint job on the victim's vehicle. Huggins argues that because this information was released to the media, the prosecutor's argument is incorrect. However, the prosecutor's argument is a fair presentation of the evidence presented at trial. Additionally, the record does not establish that the defense objected to this statement. Huggins cannot establish

that the prosecutor's argument constituted fundamental error. Furthermore because other witnesses testified that they saw Huggins driving the victim's vehicle, he cannot demonstrate that he was prejudiced by the State's closing argument. Accordingly, he cannot demonstrate that he received ineffective assistance of appellate counsel for failing to raise this issue on direct appeal. Therefore, we deny this claim.

Lastly, Huggins uses his petition to reassert his postconviction argument that the trial court improperly denied his written and verbal motions to have the leg brace removed. Because his claim is not properly raised in a petition for a writ of habeas corpus, we deny relief.

## CONCLUSION

Because Huggins has failed to establish he is entitled to relief, we affirm the postconviction court's denial of Huggins' 3.851 motion and we deny his petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Orange County,
     Belvin Perry, Jr., Judge - Case No. 481998CF007190000AOX

And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Middle Region, and David Robert Gemmer, Assistant Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, and Lisa-Marie Krause Lerner, Assistant Attorney General, West Palm Beach, Florida,

for Appellee/Respondent